A. V. WEAVER ET AL. v. J. T. ROBISON, COMMISSIONER OF GENERAL LAND OFFICE, ET AL.

No. 4060.   Decided December 20, 1924.

(263 S. W., 133).

1.—Public Land—Sale—Forfeiture—Resale—Advertisement.

Under the Act of April 3, 1919, Laws, 36th Leg., p. 312, amending Rev. Stats., 1911, art. 5408, the Land Commissioner was authorized to make resale of land formerly sold by the State only on classification and advertisement made after its restoration to the public domain by declaration of forfeiture of the rights of the previous purchaser. (Pp. 275-287).

**2.—Same.**

A sale by the Land Commissioner of land formerly sold without advertisement made after forfeiture, the advertisement being of land subject to forfeiture if payment was not made before such resale day, being beyond the authority of the Commissioner, a purchaser at such resale acquired no rights which would prevent the former purchaser from reinstatement on payment. (Pp. 286, 287).

**3.—Same—Legislation Reviewed.**

The course of legislation on the subject of sale of public land preceding and leading up to the Act of April 3, 1919, is reviewed at length with reference to its bearing on the construction and effect of that Act. (Pp. 276-288).

**4.—Statutory Construction.**

When the Legislature has spoken in plain language courts are not concerned with the policy or justice of its effect, though some other method may seem better. (P. 288).

**5.—Same—Forfeiture.**

Forfeitures are not favored by law and the steps prescribed by law therefor must be strictly followed. (P. 289). ?

**6.—Same—Negative Provision.**

Where the law prescribes certain procedure for accomplishing forfeiture negative words as to other methods are not needed to confine executive power to the steps prescribed. (P. 289).

**7.—Practice of Department.**

In determining the effect of a statute (Act of 1919) on forfeiture and resale, the method pursued by the Land Office under previous statutes can not be considered as established executive construction affecting the later and different Act. (P. 290).

**8.—Advertisement.**

Sale within three days after forfeiture did not afford time for necessary advertisement thereof. (Pp. 290, 291).

Original application to the Supreme Court by Weaver for writ of mandamus against Robison, as Commissioner of the General Land Office. Anna Simmons and H. F. Wood, claimants of the land as purchasers adverse to relator, were made co-respondents.

The Supreme Court, having referred the case to the Commission of Appeals, Section B, for their opinion thereon, here adopts same and awards the writ as therein recommended.

*W. H. Bledsoe, Percy Spencer, Black & Morrow* and *Chas. L. Black,* for relators.

*W. A. Keeling,* Attorney General, and *Weaver Moore,* Assistant, for respondent Robison.

*W. A. Gillenwater* and *G. B. Smedley,* representing one Wootten, interested in the decision as litigant in another case, filed argument as *amici curiæ* in opposition to the award of mandamus.

Mr. Presiding Judge POWELL delivered the opinion of the Commission of Appeals, Section B.

On July 5, 1906, Section 448, Block D, Yoakum County, Texas, was sold by the State of Texas to one Myrtle Hicks. At the time of its sale it was classified as "dry grazing" land and appraised at $1.25 per acre. It was sold at that price. The purchaser paid one-fortieth of the purchase money and executed her obligation for the balance of such unpaid purchase money. This land, through mesne conveyances, went into relators in this proceeding.

The interest due on this purchase on November 1, 1919, 1920, 1921 and 1922, respectively, was not paid. Default had been made in interest payments for each of the four years. Therefore, in May, 1923, Commissioner Robinson caused to be prepared a list of school lands which would come upon the market September 1 thereafter. This list included the section of land in suit, but the provisions therein with reference to this tract were as follows:

"Most of the land in this list is subject to be forfeited for non-payment of interest, and such as may not be paid on will be forfeited and come on the market September 1, 1923, but that which may be forfeited can be redeemed by the payment of necessary interest before 10:00 o'clock a. m., September 4."

The advertised list contained hundreds of tracts of land, but the tract in suit, in its *immediate place of listing,* was described as being: "subject to forfeiture for non-payment of interest, and if not redeemed, will be on market September 1, 1923". In cases of other tracts of land, it was stated that they were "formerly forfeited for non-payment of interest, and if not redeemed, will be on market September 1, 1923".

On August 31, 1923, the tract in suit was forfeited in exact accordance with the statutes and the file of papers in the case marked "land forfeited": The Commissioner signed it officially. On the same day, but after this formal forfeiture, he classified the land as "mineral and grazing" and appraised it at $3.00 per acre. In the list afore-mentioned, the land in suit was listed as mineral and grazing land and at the same value. In other words, the formal re-classification and re-valuation entered after the forfeiture was the same as unofficially made at the time the advertisement was prepared about three months before the sale day. This unofficial classification was also printed in the advertised list in May.

As stated in the advertisement, September 2 was Sunday and September 3 a legal holiday. Therefore, the bids were opened at 10:00 o'clock A. M., September 4. Relators did not bid. But, the land was sold to Anna Simmons, upon a bid lawful in every sense. She paid $3.50 per acre for it. The award was made September 18, 1923. Anna Simmons later sold the land to one H. F. Wood.

On or about October 19, 1923, relators tendered to the Commissioner of the General Land Office all past due interest on the original sale and made application to the Commissioner to have the original sale reinstated in their names. The Commissioner refused this request because he claimed the rights of Anna Simmons had intervened.

On October 29, 1923, upon proper petition therefor, the Supreme Court permitted the relators to file a petition for writ of mandamus against the Commissioner of the General Land Office and Anna Simmons and H. F. Wood. Such petition was filed. The Commissioner alone has filed an answer.

It was conceded by counsel for respondents in argument that relators would be entitled to be reinstated unless the sale to Anna Simmons was lawful and binding. This oral statement was made because in his answer the Commissioner contended that, in seeking reinstatement, relators had not tendered the deed from R. L. Merritt into them. But, counsel for the Commissioner stated they had, since preparing the answer, learned from the Commissioner that he had agreed with counsel for relators to waive that requirement and not urge the same as against the right to reinstate. In view of that fact, counsel for the Commissioner stated to the court that they wished to withdraw that portion of the answer and drop the matter. The Commissioner was present in person and agreed this was true. Therefore, as presented to us, relators are entitled to reinstatement unless the sale to Anna Simmons was lawful. On the other hand, it is admitted by counsel for relators that the sale to her is entirely lawful and regular if Article 5408 of our Revised Civil Statutes has been complied with. Consequently, we have but one question before us and that is the construction of this Article of our statutes as applicable to the instant case. And, more specifically still, the sole question is whether or not the advertisement of this land for sale and its classification as already set out by us was in compliance with the statute. It is admitted that if the Commissioner had forfeited the land in May, 1923, in accordance with the statute and in the mode provided therein, and thereafter before the next sale day reclassified and revalued the land, the advertisement would have been adequate and lawful. And, because of default in payment of interest the Commissioner was authorized to forfeit the land in May, 1923. But, since he did not so forfeit the land, but proceeded to advertise it for sale prior to forfeiture, relators contend that the advertisement was premature; that there can be no resale without lawful advertisement; therefore, the sale to Anna Simmons was unlawful and of no force or effect according to their contention. In determining the question at issue a brief history of our statutes

with reference to the forfeiture and sale of public lands will probably be helpful.

Prior to 1897, and under the Act of 1879, the forfeitures for non-payment of interest were to be enforced "by a proceeding in court instituted upon the certificate of the Commissioner showing such non-payment. Copy of the judgment was to be filed in the Treasurer's office and he was to endorse the obligation forfeited and send it to the Land Office, where it was thereafter to be kept".

But, under the Act of 1897 we find the following with reference to forfeitures:

"Be it enacted by the Legislature of the State of Texas: That if upon the first day of November of any year any portion of the interest due by any person to the State of Texas for lands heretofore sold by the State of Texas, whether said lands be a part of the public domain or shall have been heretofore set apart for the public schools, university, or any of the other various State institutions, has not been paid, it shall be the duty of the Land Commissioner to indorse on the obligation for said lands, 'Lands forfeited,' and shall cause an entry to that effect to be made on the account kept with such purchaser, and thereupon said lands shall thereby be forfeited to the State, without the necessity of re-entry or judicial ascertainment, and shall revert to the particular fund to which it originally belonged, and be resold under the provisions of the existing law, or any future law; provided, the purchaser of said land shall have the right, at any time within six months after such indorsement of 'Lands forfeited,' to institute a suit in the District Court of Travis County, Texas, against the Commissioner of the General Land Office, for the purpose of contesting such forfeiture and setting aside the same, upon the ground that the facts did not exist authorizing such forfeiture, but if no such suit has been instituted as above provided, such forfeiture of the Commissioner of the General Land Office shall then become fixed and conclusive".

The Act of 1897, as quoted, is still the law, under the Act of 1919, except that the six months allowed for filing suit in Travis County to test the forfeiture so made is limited to those who purchased land prior to August 20, 1897 and except also that the Act of 1919 recognizes the force and effect of Judge Williams' opinion in the case of Brightman v. Comanche County, 94 Texas, 559, 63 S. W., 857, and two later decisions of our Supreme Court, by providing that the forfeiture shall be made by entering the words stated on the "wrapper containing the papers".

The Act of 1897 and 1919 each contain the following provision:

"In any cases where lands have been forfeited to the state for the non-payment of interest, the purchasers, or their vendees, may

have their claims reinstated on their written request, by paying into the treasury the full amount of interest due on such claim up to the date of reinstatement, provided that no rights of third persons may have intervened. In all such cases, the original obligations and penalties shall thereby become as binding as if no forfeiture had ever occurred."

It is by virtue of the latter provision that relators ask this reinstatement.

With reference to the forfeiture section of the Act of 1897, Judge Williams, in the opinion above referred to, said:

"That the mere default of the purchaser does not, ipso facto, put an end to the contract, but that the Commissioner must exercise the authority given by the statute at the time and in the manner prescribed has also been decided."

Again, we quote from his decision as follows:

"As we have seen, the statute distinctly and imperatively required the Commissioner to forfeit all sales when interest was not paid as required, thus forbidding him to make any exception."

With reference to the sale of public lands, we find that, under the Act of 1895, carried forward as Article 5405 of Vernon's Sayles' Revised Civil Statutes of Texas of 1911, "all lands set apart for the benefit of the public free schools, the lunatic asylum, the blind asylum, the deaf and dumb asylum, and the orphan asylum shall be sold and leased under the provisions of this chapter." Then, Article 5406 of said statutes, passed at the same time, provides:

"The Commissioner of the general land office is hereby vested with all the power and authority necessary to carry into effect the provisions of this chapter, and shall have full charge and discretion of all matters pertaining to the sale and lease of said lands, and their protection from free use and occupancy and from unlawful enclosure, with such exceptions and under such restrictions as may be imposed by the provisions of this chapter, or by the constitution of the state. He shall, as soon as practicable, adopt such regulations not inconsistent with the constitution or this chapter as may be deemed necessary for carrying into effect the provisions of this chapter, and may from time to time alter or amend such regulations so as to protect the public interest; but all regulations shall be submitted to the governor for his approval before adoption or promulgation. He shall adopt all necessary forms of applications for sales or leases, and all other forms necessary or proper for the transaction of the business imposed upon him by this chapter, and may, from time to time, call upon the attorney general to prepare such forms; and it shall be the duty of that officer to furnish the commissioner of the general land office with such advice and legal

assistance as may be requisite for the due execution of the provisions of this chapter; and it shall be the duty of such commissioner to call upon the attorney general for advice whenever there is any doubt as to the meaning of this chapter, or any provisions thereof.''

In speaking of this very Article of our statutes, Chief Justice Gaines, in case of Sanford v. Terrell, 87 S. W. R., 655, says that, under it:

''The Commissioner of the General Land Office is nominally invested with a very enlarged discretion in reference to the sale and lease of the school and asylum lands. But the restrictions with reference to the sale of the lands are so specific as to deprive him practically of all discretion whatever as to that matter.''

A brief review of the statutes since the Act of 1895 shows that the Legislature has continued to specifically restrict the authority of the Land Commissioner in making sales of the public lands of this State.

Under the Act of 1901, it was made the duty of the Land Commissioner to ''notify in writing the county clerk of each county the classification and valuation fixed upon each section of land in his county''. And, there was the further provision that he should send ''forthwith'' to each county clerk by registered mail a correct and revised list of all ''unsold'' lands therein. Again, he was required to notify the clerk of each county immediately upon the sale of any tract of land in that county, the terms of sale, etc. The Act provided form of applications from any one desiring to purchase any unsold lands, but no sales dates were fixed.

In the case of Smithers v. Lowrance, 100 Texas, 77, 93 S. W., 1064, our Supreme Court held that the Act of 1901, covering ''each section of land'' in the county was broad enough to embrace sold and unsold lands, and that both kinds could be classified at any time.

The next Act in this connection was that of 1905 which was carried forward in the Revised Statutes of 1911. The Act of 1905 remained a law until the passage of the Act of 1919 which amended various sections of the 1905 statute. It is true that in 1915 the Legislature, for the first time, fixed definite sale days for sale of all the public lands. That Act was expressly repealed by the Act of 1919, but the latter Act retained the same sale days as were provided for in the Act of 1915.

Therefore, it becomes interesting to note the terms of the Act of 1905 and particularly the changes made therein by the Act of 1919.

Section 1 of the Act of 1919 reads as follows:

''On the first day of September 1919, and the first day of each January, May and September of each year thereafter, all the unsold lands set apart for the benefit of the public free school fund, the

Lunatic Asylum fund, the Blind Asylum fund, the Deaf and Dumb Asylum fund, the Orphan Asylum fund, which have heretofore been surveyed or that may hereafter be surveyed and unsold portions of same shall be subject to sale by the Commissioner of the General Land Office under the regulations and upon the terms provided in this Act; provided, no land leased before the passage of this Act shall be subject to sale until the first sale date after the termination of the lease. No corporation shall purchase any land under this Act.''

Then, Section 2 of the Act provides that ''Article 5407 of the Revised Civil Statutes of 1911 shall be so amended as to hereafter read as follows:

''Article 5407. The Commissioner of the General Land Office shall from time to time, as the public interest may require, classify or reclassify, value or revalue, any of the lands included in this Act, designating the same as agricultural, grazing or timber, or a combination of said classifications, according to the facts in the particular case, and when entry of the classification and the appraisement is made on the records of the General Land Office, no further action on the part of the Commissioner, nor notice to the County Clerk shall be required to give effect thereto. No land classed as agriculatural shall be sold for less than one dollar and fifty cents per acre and no land classed as grazing shall be sold for less than one dollar per acre. The land included in this Act shall be sold with the reservation of the oil, gas, coal and all other minerals that may be therein to the fund to which the land belongs and all applications shall so state. Timber on land shall be sold for cash at its fair market value. The Commissioner shall notify the clerk of the proper county of the sale of each tract, giving the name and address of the purchaser together with the price of the land. When informed of the sale of any land the clerk shall enter on his books opposite the description of the land sold, the name of the purchaser and the date sold, and the notice of such sale and the books of record and entry shall be considered public records, and be open to public inspection, and it is hereby made the duty of the county clerk to exhibit the said records to any person who shall apply therefor.''

Article 5407, before so amended, had read as follows:

''Art. 5407. Classification and valuation.—The commissioner of the general land office may, from time to time, as the public interest may require, classify or reclassify, value or revalue, any of the lands set apart for the benefit of the public free school, lunatic asylum, the blind asylum, the deaf and dumb asylum and the orphan asylum, designating the same as agricultural, grazing, or timbered land according to the fact in the particular case; and he may

prescribe such regulations in relation thereto as he may deem necessary to secure a correct classification; provided, all agricultural lands shall be sold at not less than one dollar and fifty cents per acre, and all grazing lands shall be sold at not less than one dollar per acre. He may also reclassify any lands heretofore erroneously classified, upon the official certificate of the commissioners' court of the county in which said land is situated, or of the county to which such county is attached for judicial purposes, certifying what the proper classification should be, said certificate to be signed by the entire commissioners' court, including the county judge, or upon such other evidence as may be satisfactory to the commissioner. And it shall be his duty to notify in writing the county clerk of each county the classification and valuation affixed upon each section of land in his county, and each county attached to it for judicial purposes; and he shall forward the same to the county clerk of the county for which said list was made, or to the county clerk of the county to which the said county is attached for judicial purposes. The said commissioner shall also notify said clerk of each and every sale as soon as they are made. Upon receipt of said list, or any notice required to be given under the provisions of this act, the county clerk receiving the same shall forthwith file and record said list or notice in a well bound book to be kept for that purpose. When informed of the sale of any land, the clerk shall enter on his books, opposite the description of the land so sold, the name of the purchaser and the date sold, and the said list and notice of sale so furnished the said clerk, and the said books shall be considered public records, and be open to public inspection; and it is hereby made the duty of the county clerk to exhibit the said book and the records to any person who shall apply therefor. When any portion of said land has been classified to the satisfaction of the commissioner of the general land office, under the provisions of this chapter, such land shall be subject to sale, but to actual settlers only, except where otherwise provided by law; provided, that the purchaser shall not include in his purchase more than two sections of agricultural land.''

The Act of 1919 then provides that Article 5408 of the 1911 Revised Civil Statutes shall hereafter read as follows:

''Article 5408. In cases where any land included in this Act may be leased and the same may come on the market by reason of the expiration or cancellation of such lease or in cases where land may be sold and revert to the fund to which it originally belonged by reason of the forfeiture or cancellation of the sale, it shall be the duty of the Commissioner to classify and value same before the next sale date thereafter and adopt such means as may be at his command that will give the widest publicity and general information as to

when such land and other unsold land will be on the market for sale, together with the terms and conditions upon which the land may be purchased. No tract of land shall be subject to sale until it shall have been advertised. If there are no other satisfactory or sufficient means at the command of the Commissioner that will give the necessary publicity he shall have printed at the expense of the State, to be paid out of the appropriation for public printing, lists of the land for free distribution to the public. The lists shall ccntain a brief statement of how one shall proceed to buy the land.''

· Before amended, Article 5408 had read as follows:

''Art. 5408. Advertisement of land.—In cases where lands may be leased and the same shall come on the market by reason of the expiration of such lease, it shall be the duty of the commissioner to notify the county clerk ninety days, when practicable, before the expiration of such lease of the date of such expiration. When a lease is for any cause canceled, he shall notify the county clerk of that fact and fix a date not less than ninety days thereafter on and after which applications to purchase may be filed. All notices of expiration and cancellation of leases shall be forthwith recorded as required for notices of classification and valuation. The commissioner shall adopt such means as may be at his command that will give the widest publicity as to when land will be on the market for sale by reason of expiration of any lease. Such publicity shall, when practicable, be given ninety days in advance of such expiration. When a lease is canceled for any cause, the land shall not be for sale until ninety days thereafter. Immediately after the cancellation of a lease or leases the commissioner shall proceed to give publicity to the fact, the same as is herein required with reference to publicity of expiring leases. If there are no other satisfactory or sufficient means at the command of the commissioner that will give the necessary publicity, he shall have printed at the expense of the state, to be paid out of the appropriation for public printing, a list or lists of the lands, and send them out in the mail and to every person requesting them. Such lists shall also contain a brief statement as to how one shall proceed to purchase the land.''

The Act of 1919 then provides that Article 5409 shall hereafter read as follows:

''Article 5409. One desiring to buy any portion of the land included in this Act shall transmit to the Commissioner of the General Land Office a separate application for each tract applied for together with the affidavit of the applicant to the effect that he desires to purchase the land for himself and that no other person or corporation is interested in the purchase thereof either directly or indirectly and one-fortieth of the aggregate price offered for the

land and the obligation of the applicant in a sum equal to the amount of the unpaid purchase price offered for the land, binding the purchaser to pay to the State at the General Land Office at Austin, Texas, on the first day of November thereafter and on the first day of November of each year thereafter until the whole purchase price is paid, one-fortieth of the aggregate price with interest on the unpaid purchase price at the rate of five per cent per annum. Upon receipt and filing of the application, affidavit, obligation and the one-fortieth part of the price offered, the sale shall be held effective from that date. If the interest on any sale should not be paid when due, the land shall be subject to forfeiture by the Commissioner entering on the wrapper containing the papers 'Land forfeited,' or words of similiar import, with the date of such action and sign it officially, and thereupon the land and all payments shall be forfeited to the State and offered for sale on a subsequent sale date.''

Prior to its amendment, Article 5409 had read as follows:

''The purchaser shall transmit to the land commissioner one-fortieth of the aggregate purchase money for the particular tract of land, together with his application, affidavit and his obligation to the state, duly executed, binding the purchaser to pay to the state on the first day of November of each year thereafter, until the whole purchase money is paid, one-fortieth of the aggregate price, with interest at the rate of three or five per cent per annum, according to his purchase, on the whole unpaid purchase money, which interest shall also be payable on the first day of November of each year; and upon receipt of one-fortieth of the purchase money, and the affidavit and obligation aforsaid, by the commissioner, the sale shall be deemed and held effective from the date the application, affidavit and obligation are filed in the general land office.'

The Act of 1919 then amends other Articles of the statutes of 1911. The Revised Statutes had merely re-enacted the Act of 1905. The 1919 Act did not amend several Articles of the 1911 statutes. We have quoted the only changes which can have any bearing upon the instant case.

Certain portions of the Act of 1905 undertook, with reference to certain lands, to provide for competitive bidding and a certain kind of advertising. But, in the case of Estes v. Terrell, 99 Texas, 622, 92 S. W., 407, our Supreme Court held that this was limited only to leased lands which came on the market in a certain way. Therefore, the court held that, with reference to practically all lands, they still, after the Act of 1905, came on the market automatically upon receipt by the county clerk of the notice of the previous forfeiture and classification and valuation. It was not until the Act

of 1919 that the law itself expressly provided for a reclassification and revaluation of the land which had already been sold.

After the decision last mentioned, the next step was the Act of 1915, which, for the first time, fixed definite sale dates. Then came the Act of 1919 changing from the county clerk system and incidents appertaining thereto to the new system centering in the Land Office.

It will be observed that, prior to 1919, and under the Act of 1905, the Commissioner was authorized "from time to time, as the public interest might require, to classify or reclassify, value or revalue, any of the lands set apart for the benefit of the public free schools," etc. In 1913, several years after the Act of 1905 became effective, our Supreme Court, in the case of State v. Dayton Lumber Company, 106 Texas, 41, 155 S. W., 1078, through Justice Phillips said:

"Lands that are validly sold become segregated from the mass of lands held in the several funds, and can not be said to thereafter 'belong' to such funds. Upon the sale the obligation of the purchaser belongs to the proper fund, taking the place of the land as an asset of the fund, but such is not the status of the land. It is evident, therefore, that the purpose of the Act in relation to suits, as reflected in the title, was not to provide for suit by the State in respect to lands formerly belonging to the several funds but of which the State had made sales, valid in their inception and remaining in good standing, but was to authorize such action by the State only in respect to lands whose status was such as to constitute them still the property of such funds."

Probably bearing in mind the language of Judge Phillips just quoted, which is the latest expression of our Supreme Court upon that point, the Legislature, in the Act of 1919, clearly and expressly distinguished between unsold lands and those which had already been sold. Furthermore, it expressly provided the method by which lands formly sold could again revert to the funds to which they had belonged and then become unsold lands again.

For instance, in the very first section of the latter Act, it was provided that all the "unsold" lands belonging to the funds named should be subject to sale on certain days. Realizing that leased lands, already under lease when the Act was passed, were necessarily *unsold* lands, and not desiring that such lands be subject to sale at any time on the dates named, the Legislature expressly provided in this first section that no such leased lands should be subject to sale until the first sale date after the termination of the lease. The Act was carefully written. It was a Senate Bill sponsored by Senator Buchanan of west Texas where so many of the unsold public lands are located. Since, in a later section of the Act, leased lands

were to be placed in the same class with sold lands, the authors realized that some misunderstanding might possibly arise unless the first section of the Act should expressly provide that leased lands, necessarily unsold lands, should be excepted from the general provision as to unsold lands. The authors of the measure made an apparent effort to write this Act so as to contain no possible inconsistencies in this respect. We think they succeeded in doing so.

The second section of the Act of 1919 authorizes the Commissioner to classify or reclassify, at any time, the lands "included in this Act", which had already been described as "unsold" lands set apart to these funds. Under the Act of 1905, this right of the Commissioner, so far as the language of the Act went, attached to "*any*" of the lands so set apart. If no change was intended by the Act of 1919, why was the word "unsold" added to the statute? Instead of providing that any of the land set apart should be classified and valued and sold at any time, the new Act provided that only the unsold lands so set apart should be handled that way.

A reading of the Act makes it quite clear that the Commissioner could, at any time named in the first section of the Act, offer for sale lands not theretofore sold; but, that a different rule should apply to lands theretofore sold, and with reference to such lands, the new statute provided that they should be reclassified and revalued before the first sale date after forfeiture and then be offered for sale on the market.

Again, a reading of the Act also shows that classification and valuation, or reclassification and revaluation, of lands not theretofore sold could be fixed at any time. But, a different rule was prescribed with reference to land theretofore sold and which should come back into the fund by reason of forfeiture. The Act expressly provides that such lands shall be revalued and reclassified before the first sale date after such forfeiture. The Act unquestionably treats unsold land and land heretofore sold separately and differently.

Article 5408 of the Act of 1919, heretofore quoted, places leased land and sold land on the same plane. The first section of that Act expressly stated that the general rule should not apply to leased land. Then, in this later section, the Act makes the very same provision for handling leased and sold lands which may again come back into the fund by reason of forfeiture. The new Article 5408 gives, in clear and logical sequence, the various steps by which land heretofore sold may revert to the fund, be reclassified and again offered for sale. The Act says the Commissioner shall give the widest publicity as to when such land (that reverting by forfeiture) and "*other unsold land*" will be on the market. In other words,

after forfeiture (and the exact method for forfeiting is also expressly provided in the Act) the forfeited land again becomes unsold land and takes its place along with other unsold land..

It seems that the Attorney General of Texas was not called upon to give any advice as to whether or not the Act of 1919 required any change in the method of advertising public lands for sale. But, he was asked to advise whether or not *each* list of lands for sale should include all lands theretofore forfeited and remaining unsold. The Attorney General held that they should; that land, advertised once and not sold, must be advertised again for a subsequent sale date and could not, on a later sale date, be sold upon an old advertisement. In that opinion, rendered May, 1921, the Attorney General clearly recognized that the Legislature, in the Act of 1919, had made this distinction heretofore outlined by us, and that "unsold lands" included only the lands which were "not at any time sold". For instance, we quote from that opinion as follows:

"We have already held that all unsold surveyed lands mentioned in Section 1 of the Act of April 3, 1919, that have been classified and valued can be sold only on the respective dates named in that section. Other provisions of the Act make it the duty of the Commissioner of the General Land Office to 'adopt such means as may be at his command that will give the widest publicity and general information as to *when such land and other unsold land'*— which undoubtedly includes all properly classified and appraised surveyed lands mentioned in Section 1 of this Act and that are at any time not sold—*'will be on the market for sale.'*

"Further provision is made for the free distribution to the public of printed lists of these lands. This evidently contemplates a list of all the surveyed lands mentioned in Section 1 of this Act that have been classified and appraised and that were not sold on the next preceding sales date." (Italics by the writer (Assistant Attorney General) of the opinion.)

Of course, the Attorney General was not giving any direct expression of opinion concerning the issue now before us. But, he does state that unsold land does not include land at any time sold. It must revert to the fund, in the manner provided by statutes, before coming under the terms of the Act of 1919 and taking its place with "other unsold lands".

The Act of 1905, as amended by the Act of 1919, still provides that the Commissioner shall forfeit any contract "if upon the first day of November of any year any portion of the interest due" thereon remains "unpaid". Then, it is provided that this forfeiture shall be effected by the Commissioner "entering on the wrapper containing the papers 'Land forfeited', or words of similiar import," with the date of such act and sign it officially.

There is no pretense that there was any forfeiture of the land in suit in May, 1923, when the advertised list was sent out. The list affirmatively showed no forfeiture, but merely a threat of forfeiture if no payment of interest was made by a certain time. The Acts of 1905 and 1919 provide that lands forfeited shall be "resold under the provisions of this chapter or any future law". The law contains no provision for sale of any land sold until it shall, by forfeiture or cancellation of contract of sale, revert to the fund to which it had originally belonged. There being no forfeiture as and in the manner provided by statute, and no cancellation of the contract, the land in suit was not ready to be offered for sale until the formal forfeiture on August 31, 1923, which was two or three months after the advertisement in suit had been sent forth.

Again, there is no authority in the Act for *advertising* the sold land for resale until it has reverted to the fund by forfeiture. Article 5408 shows that when it shall have reverted by forfeiture, *then* it shall be reclassified before next sale date, and *then* advertised for sale. No other meaning of Article 5408 is possible, we think. And, as already shown, Article 5408, before it was amended, referred only to leased lands. Not only so, but it provided, before amendment, for publicity ninety days in advance of expiration of leases as to when the lease would expire and the land come on the market. The Article had expressly provided for advertisement in anticipation of expiration. But, in the Act of 1919, all such provisions were eliminated from Article 5408 and leased and sold lands treated alike. Surely, some significance should attach to the action of the Legislature in eliminating all of these features when they came to amend this Article. It cannot be assumed that they did not know what the Article contained when they went to amend it. Their action in leaving out the authority for advertisement in anticipation of the expiration of a lease speaks volumes to us. It clearly indicated that they did not want land offered to the public for sale until the lease thereon had expired or until the sold land had, by the process provided, again taken its place as the property of the State. Not only did the Legislature amend this Article by eliminating these features therefrom, but in Section 1 of the Act it was expressly provided that leased land should not be subject to sale until the first sale date after the termination of the lease. We have already shown that this was done so that there could be no mistake in the intention of the Legislature that leased land should not be considered ordinarily as unsold land for the purpose of that Act.

But, not only do the aforesaid changes evidence the intention that land shall not be advertised for sale before it is subject to sale, but there was also *added* by the law makers to Article 5409, as amended

in 1919, the statement that when forfeiture as therein provided has been had, "*thereupon* the land and all payments shall be forfeited to the State and offered for sale on a subsequent sale date". In other words, it is only after forfeiture, or as the new statute says "*thereupon*", that sold land can be "offered for sale". Now, the only way provided by the statute for offering this land for sale is by advertising and publicity as contained in Article 5408, as amended. And, yet, it is said therein that no land shall be sold until advertised. Consequently, since the advertisement in suit was sent out before forfeiture of any kind, much less the kind prescribed in the statute, had occurred, the advertisement was of no force or effect. That was the only advertisement sent out before the land in suit was sold to Anna Simmons. Therefore, there being no valid advertisement, and such an advertisement being a prerequisite to a valid sale, the sale to her was void. Consequently, the relators are entitled to reinstatement as prayed for.

Not only was the advertisement premature, but it showed a reclassification and revaluation had *before* and not *after* forfeiture. The reclassification must come after forfeiture. The Act of 1919, for the first time, expressly required reclassification after forfeiture. It is conceded by all counsel that the advertisement must contain classification and valuation as a part of the "terms and conditions" of sale, otherwise no intelligent application or bid could be prepared by prospective purchasers. The new Act expressly provided that the advertisement should contain the terms and conditions of the sale. No such provision had been in any prior statute.

Briefly, we have shown that the Act of 1919 marked the following important changes, as stated by counsel for relators:

"First. Its provisions plainly relate only to 'unsold' lands.

"Second. It prescribes a definite method for the classification, valuation and advertisement for resale of lands once sold and the prior sales of which may be forfeited or cancelled. It expressly requires a reclassification and valuation of such lands.

"Third. It expressly requires advertisement of such lands before they are resold. The Act provides: 'No tract of land shall be *subject* to sale until it shall have been advertised.'"

No other statute had ever provided that "no tract of land shall be subject to sale until it shall have been advertised". This advertisement is of first importance. No notice to the County Clerk is any longer required. No notice to the defaulting purchaser is required. This advertisement is the only notice provided for all interested parties. It is of the very essence of a resale of sold lands, or any other kind of land. Therefore, it is material and the provisions should be strictly complied with. Under the former laws,

the county clerk was required to have definite and positive information of certain kinds with reference to forfeited lands before they ordinarily come on the market again. This advertisement by the Land Commissioner is now substituted for the old county clerk system. Therefore, we think the advertisement should state positive and affirmative information, so far as the statute requires, of the facts with reference to the land that is to be sold.

Some may ask why the Legislature has prescribed this method of advertisement rather than the one used by the Land Commissioner. Some may think the latter's method the better one. Some may say there is no reason why sold land should not be offered for sale again before it has been forfeited. But, when the Legislature has spoken in plain language there is no room for construction. Nor, under those circumstances, are the courts to be concerned with the policy of the enactment or the justice of its effect. Along this line, our Supreme Court, as far back as the case of Engelking v. Von Wamel, 26 Texas, 472, said:

"Where language is plain and unambiguous, there is no room for construction. It is never permissible to resort to subtle or forced construction to limit or extend the meaning of language. And, where words or expressions have acquired a definite meaning in law, they must be so expounded."

Later, our Supreme Court, in the case of Fire Association of Phila. v. Love, Commissioner, 101 Texas, 376, 108 S. W., 158, 810, states:

"The construction which the Relator seeks to have placed upon this language would not be a declaration of the intention of the Legislature in the enactment of the law, but the expression of the will of the Court and the application of it to the particular case. It is not permissible for a Court no matter what its opinion might be of the policy of the enactment or of the justice of its effect, to substitute its own opinions with regard to such matters for the plain and clearly stated intention of the legislative department."

The provisions of the statutes affecting forfeiture and resale of school lands constitute the sole guide for the Land Commissioner. By them he is bound.

In the case of Pohle v. Robertson, 102 Texas, 274, 115 S. W., 1166, Justice Williams says:

"The legal efficacy of a purchase of school land comes from the law which gives effect to the taking of the steps by which it authorizes the acquisition of title, and not from the consent of the officer to an application."

In the case of Foster v. City of Waco, 113 Texas, 352, 255 S. W., 1104, Chief Justice Cureton says:

"Where power is granted and the method of its exercise prescribed, the method excludes all others and must be followed."

In the case of Ferguson v. Halsell, 47 Texas, 421, Chief Justice Roberts had under consideration the statute authorizing the County Court to sell real estate belonging to the county. He said:

"Although this statute is permissive in its terms, yet it is the only mode expressly pointed out in the general laws of the State by which the County Court, can divest the county of its title to its real estate. No special law as applicable to this case has been referred to. The general doctrine is that, as the County Court is the agent of the county in its corporate capacity, it must conform to the mode prescribed for its action in the exercise of the powers confided to it. The prescribing of a mode of exercising a power by such subordinate agencies of the government has often been held to be a restriction to that mode."

In the case of State v. Opperman, 74 Texas, 136, 11 S. W., 1076, Justice Gaines declares:

"The Legislature have constituted the Land Boards the agents of the State for the sale of the lands and have prescribed the manner in which their powers are to be exercised  *  *  *  *  and we are of opinion that the Land Boards were only empowered to sell the lands in the manner therein prescribed and that a sale made in any other manner was unauthorized and void."

In the case of Day Land & Cattle Company v. State, 68 Texas, 526, 4 S. W., 865, Justice Stayton spoke as follows:

"The powers of all officers are defined and conferred by law and of these all persons who deal with them must take notice. Acts done in excess of the powers conferred are not official acts."

It is a universal rule that in all steps in a forfeiture proceeding the rights of the party whose contract is being finally forfeited should be carefully guarded and the law strictly enforced. Forfeitures are not favored.

It is contended that even if the statute does provide that sold land shall be reclassified and revalued and offered for sale *after* forfeiture, that it does not also provide that it shall *not* be so handled *before* forfeiture. And, that, since no negative provision is found, it can be handled before forfeiture. This contention is not sound. As counsel for relators so well say, "negative words are not needed to restrain the scope of executive power." Chief Justice Cureton's opinion in the case of Foster v. Waco, is exactly in point. There, the law provided definite methods to be adopted by cities in raising funds for a certain purposes. Another method, not *prohibited* by law, was adopted by the city. But, Judge Cureton held that the methods affirmatively provided in the law were *exclusive*.

114 Tex. Crim.—19.

Under Article 5423 of the Act of 1919, relators were entitled to a reinstatement until a valid sale to another had been made. It is the contention of relators that no valid sale could be made until lawful advertisement had been had; that the advertisement was not valid until the land became subject to sale as a result of forfeiture. The right of reinstatement is a valuable one. These parties have the right to come here and assert it. This was an attempted resale of land not on the market and it is well settled that such a resale of land not subject to sale at the time in question is a void proceeding. See: Mound Oil Company v. Terrill, 99 Texas, 265, 92 S. W., 451; Boswell v. Terrell, 97 Texas, 259, 78 S. W., 4; Anderson v. Neighbors, 94 Texas, 238, 59 S. W., 543.

All defenses urged by the Commissioner fail because of the fact that we have before us a *plain* statute, workable and practical, in which relators have a vital right, providing, step by step, for the forfeiture and resale of lands theretofore sold by the State. The law definitely fixes the time of forfeiture; its manner of being entered; that, upon being so entered, the land reverts to the fund to which it originally belonged; that, thereafter, before the next sale date, it must be reclassified and revalued; that, thereupon, advertisement must be had as to when it will be offered for sale along with other unsold lands.

The Commissioner says the advertisement used in the instant case has been in use since 1909. As to whether or not the plan so used by him satisfies the requirements of the law prior to 1919 we are not called upon to decide and we do not decide that question. But, as we have shown, the Act of 1919 wrought many changes, particularly in prescribing the exact methods for reselling lands theretofore sold.

Finally, the Commissioner contends that, even if relators are correct in their contention that the land could not be advertised until after forfeiture, that still it was formally forfeited on August 31, 1923, and bids were received until 10:00 A. M. on September 4, 1923; that prospective purchasers had September 1, 2 and 3 to acquaint themselves with the advertisement, circulation of which was continued through these days, and that those three days constituted ample time. The record shows that September 2 was Sunday and September 3 a legal holiday. That was the reason the opening of the bids was postponed to September 4. It must be assumed that the Commissioner in sending out his advertisements in May or June, 1923, two or three months before the sale, thought they were lawful and that such an amount of time was about the right time to acquaint the people of this State with the sale date, etc. He had good precedent for this. For, under the Act of 1905, in selling leased lands, ninety days' notice was required. Prospective purchasers would probably desire to investigate the lands, or have it done.

Certain applications had to be prepared in case it was decided to make a bid. It would be impossible for one to acquaint himself intelligently upon necessary points during so short a time. This is a large State and much travelling might have to be done. So, even if an advertisement, strictly in accord with the law, had appeared over Texas on the morning of September 1, 1923, we would hold that, as a matter of law, it was not sufficiently before sale day on September 4 next to comply with the purposes of the statute. So, we overrule this contention of the respondent Commissioner.

It follows, from what has been said, that we are of the view that Article 5408 of the Act of 1919 was not complied with; that there was no valid sale to Anna Simmons; that the rights or others not having intervened, relators should be reinstated under the terms of Article 5423 of the same Act.

Therefore, we recommend that the mandamus issue as prayed for by relators.

The opinion of the Commission of Appeals is adopted, and the mandamus will issue as prayed for.

*C. M. Cureton,* Chief Justice.