**COBRA OIL & GAS CORPORATION,**
Relator,

v.

**Honorable Jerry SADLER, Commissioner of
the General Land Office of Texas,
et al., Respondents.**

No. B–637.

Supreme Court of Texas.

July 24, 1968.

Rehearing Denied May 14, 1969.

Second Rehearing Denied July 2, 1969.

John W. Stayton, Austin, Marvin H. Brown, Wichita Falls, for relator.

Crawford C. Martin, Atty. Gen., J. Milton Richardson, Asst. Atty. Gen., Austin, for respondents.

POPE, Justice.

Cobra Oil & Gas Corporation, with leave of the court, filed its petition for writ of mandamus asking this court to order the Honorable Jerry Sadler, Commissioner of The General Land Office to accept its tender of rentals for certain mineral awards. Cobra has also joined a number of surface owners. Cobra's contentions are: (1) Article 5395 does not require payment of a rental to the State until the January following issuance of the awards, (2) its tender of the rentals was timely because it occurred prior to the time the Commissioner stamped and signed the files as "forfeited," (3) the Commissioner had no discretion with respect to his acceptance of the tendered rentals. We deny relator's petition for mandamus.

The Commissioner, during June and July of 1967, pursuant to Article 5388 et seq., Vernon's Ann.Tex.Civ.Stats., issued a number of mineral awards to Cobra covering 5,524.73 acres of land in Culberson, Pecos and Reeves Counties. Cobra neither paid nor tendered any rentals until November 28, 1967. On that date, according to the affidavits which accompany the petition for mandamus, counsel for Cobra went to the General Land Office in Austin, where, according to an affidavit of Cobra's counsel, the following events transpired:

"On November 28, 1967, I personally visited at the General Land Office of the State of Texas where I interviewed Mr. Victor Day of the Legal Department of the General Land Office. In the course of my visit I made specific inquiry of Mr. Day as to whether or not the mineral awards of Cobra Oil & Gas Corporation had been forfeited. Thereupon Mr. Day brought to his office the files of Cobra Oil & Gas Corporation's mineral awards concerned in the present litigation between Cobra Oil & Gas Corporation and the Honorable Jerry Sadler. Mr. Day thereupon proceeded to examine said awards and advised me that said awards had not been forfeited. Mr. Day did state that he was at that time reviewing various mineral claims for presentment for forfeiture and that, in fact, some other mineral awards had been forfeited. Immediately thereupon I tendered to Mr. Day a check in full payment of delay rentals. That check was returned to me the same day by Mr. Day with a letter from Mr. Sadler refusing tender of the rentals giving as his only reason a statement that the tender was not timely."

The Land Commissioner asserts by affidavit, however, that all of the awards "had been declared forfeited by me prior to November 28, 1967, and on November 28, 1967, my staff was engaged in the mechanical process of gathering and stamping the forfeited awards for my signature at the time Mr. Marvin H. Brown visited the General Land Office." He further asserts that at the time of Cobra's tender,

a large number of awards to Cobra and others, not parties to this action, had been stamped and signed, but a number of awards had not yet been stamped and signed. On December 29, 1967, Cobra received letters from the Commissioner which referred to the mineral awards and stated that they "have been forfeited for failure to pay the required rental in advance after the issuance of the award." The awards were forfeited on the records on November 28, 1967. The relevant statutes are:

Art. 5395. "The owner of each claim shall pay fifty (50) cents per acre annually in advance after the award *and* during the month of each succeeding January of each year thereafter; * * *." (Emphasis added)

Art. 5397. "If the locator or owner of any claim obtained under the provisions of this law or operating under this law shall fail or refuse to make the payment of any sum within thirty days after it becomes due, or if such one or an authorized agent should knowingly make any false return or false report concerning production, mining or development, or if such one should fail or refuse the proper authority access to the records pertaining to the operations, or if such one or an authorized agent should knowingly fail or refuse to give correct information to the proper authority, or knowingly fail or refuse to furnish the Land Office all correct reports required by this law, the rights acquired under the location or claim shall be subject to forfeiture by the Commissioner, and he shall forfeit the same when sufficiently informed of the facts which authorize the forfeiture, and the minerals covered by such location and claim shall be subject to sale in the manner provided for the sale of minerals under the present law. Such forfeiture may be set aside and all rights thereto may be reinstated at any time before the rights of another intervene, upon satisfactory evidence of future compliance

with the provisions of this law. Acts 2nd C.S., 1919, p. 241; Acts 1929, 41st Leg., p. 655, ch. 291, § 1; Acts 1934, 43rd Leg., 2nd C.S., p. 61, ch. 20, § 2; Acts 1935, 44th Leg., p. 77, ch. 29, § 2."

▆ Cobra contends it was not required to make rental payments until January 1968 following the issuance of the awards in June and July 1967. The contention is not supported by the requirements of Article 5395, supra. We construe the statute to require the first payment of rentals in advance after the award but within the thirty days required by Article 5397 and thereafter a like rental "during the month of each succeeding January." In our opinion the word "and" means there are initially two payments, one after the award and another during the succeeding January. Thereafter there is only one annual payment, due each January, necessary to keep the mineral award in force. The construction urged by Cobra would better fit a statute which contained identical words but omitted the word "and". We hold that the first payment was owing after the award and the next payment was owing during the first January following the award.

Cobra's next argument is that there was no forfeiture because it tendered the late rentals prior to the time the Commissioner wrote or stamped on the file wrappers for the awards suitable words which showed a forfeiture. As expressed by Cobra, " * * the critical issue is when the stamp was affixed to the award." At the outset, Cobra is faced with the problem that the forfeiture statute which applies to sulphur awards, Article 5397, is silent about the Commissioner's stamping the wrappers. Cobra arrives at its conclusion by resort to other statutes enacted at other times, and with respect to other kinds of state lands. It would write into Article 5397 requirements not found in Article 5397 but found in Articles 5326, 5350, 5360, and 5421m, Vernon's Tex.Civ.Stats. In each of those statutes, the Legislature spelled

out the act of forfeiture by requiring the Commissioner to stamp the file wrapper with words of forfeiture which he must then sign.

The legislative history of Texas public lands shows that from time to time different kinds of public lands have been the subject of specific legislation, and even the same kinds of lands have at different periods of time been handled differently from the method now employed. The forfeiture of contracts covering surface lands has been accomplished in a variety of statutory ways different from mineral lands. This is evident by comparing the history of Article 5326 with that of Article 5397. Article 5326 [1] relates to public lands classed generally as surface and timber lands. It states that upon non-payment of interest on any sale, the lands are subject to forfeiture. Forfeiture is authorized " * * * by the Commissioner entering on the wrapper containing the papers 'Land Forfeited,' or words of similar import, with the date of such action and sign it officially, * * * " Cobra says that the Commissioner can forfeit its contracts by that method and no other, and that he didn't do so prior to its tender.

Early in Texas history, sales of public lands were authorized by statutes which omitted provisions for forfeiture by any particular method. Acts 1856, 6th Leg., ch. 144, p. 71. In 1874 the Legislature authorized the sale of University lands and also lands set apart for the benefit of the common school fund. Forfeiture resulted by the Commissioner's notification of the State Treasurer of the purchaser's failure to pay his installments and interest on time, the Treasurer endorsed on the obligation a statement of such failure and signed his name. The statute also authorized a judicial ascertainment of forfeiture in a suit instituted by the district attorney. Acts 1874, 14th Leg., ch. 63, p. 72, and ch. 102, p. 142. Weaver v. Robison, 114 Tex. 272, 268 S.W. 133, 135 (1925). In 1879 the Legislature required forfeiture for non-payment of interest to be enforced by a proceeding in court with a copy of the judgment filed in the Treasurer's office who endorsed the obligation, "forfeited." Acts of 1879, 16th Leg., C.S., ch. 28, p. 26; Brightman v. Comanche County, 94 Tex. 599, 63 S.W. 857 (1901). After 1883, the statutes authorized forfeiture by the Commissioner, and also directed the manner in which he made it, which has, since that time, been by writing the words "land forfeited" or similar words upon the file wrapper. Brightman v. Comanche County, supra. Acts 1887, 20th Leg., ch. 99, p. 83. See, Acts 1891, 22nd Leg., ch. 114, p. 180; Acts 1897, 25th Leg., ch. 37, p. 39; Acts

---

1. Art. 5326. "Forfeiture for nonpayment of interest; restatement; outstanding grazing leases.

"If any portion of the interest on any sale should not be paid when due, *the land shall be subject to forfeiture by the Commissioner entering on the wrapper containing the papers 'Land Forfeited,' or words of similar import, with the date of such action and sign it officially, and thereupon the land and all payments shall be forfeited to the State,* and the lands may be offered for sale on a subsequent sale date. In any case where lands have heretofore been forfeited or may hereafter be forfeited to the State for non-payment of interest, the purchasers, or their vendees, heirs or legal representatives, may have their claims reinstated on their written request by paying into the Treasury the full amount of interest due on

such claim up to the date of re-instatement, provided that no rights of third persons may have intervened. The right to re-instate shall be limited to the last purchaser from the State or his vendees or their heirs or legal representatives. Such right must be exercised within five (5) years from the date of the forfeiture. In case there is an outstanding valid grazing lease which would prevent reinstatement within the time prescribed by this Act then such claim may be reinstated within sixty (60) days after the expiration of such grazing lease, provided application for re-instatement shall have been filed in the General Land Office within the five-year period above prescribed, accompanied with payment of all interest due thereon. In all cases the original obligations and penalties shall thereby become as binding as if no forfeiture had ever occurred. * * *."

1919, 36th Leg., ch. 163, p. 312; Acts 1941, 47th Leg., ch. 191, p. 351; Acts 1951, 52nd Leg., ch. 59, p. 92.

■ Cases arising under statutes which stated the precise manner by which the Commissioner declared and evidenced a forfeiture have held that no other method may effect a forfeiture. Underwood v. Robison, 109 Tex. 228, 204 S.W. 314 (1918); Chambers v. Robison, 107 Tex. 315, 179 S.W. 123 (1915); Adams v. Terrell, 101 Tex. 331, 107 S.W. 537 (1908); Island City Sav. Bank v. Dowlearn, 94 Tex. 383, 60 S.W. 754 (1901); Brightman v. Comanche County, supra. This rule is based upon the sound principle that "where a power is granted, and the method of its exercise prescribed, the prescribed method excludes all others, and must be followed." Foster v. City of Waco, 113 Tex. 352, 255 S.W. 1104 (1923).

■ The legislative requirement in Article 5326 (surface) for a specific method for exercising the right of forfeiture and the historical development of that article are in sharp contrast with Article 5397 (minerals) and its history. Article 5397 does not prescribe any method at all for the declaration of a forfeiture. In 1889 the Legislature enacted a law to promote the development of mineral resources. Acts 1889, 21st Leg., ch. 100, p. 116. Two years previously, the 20th Legislature had provided for forfeitures of obligations to purchase surface lands by endorsement of the words "land forfeited," upon the account kept with the purchaser. In the case of minerals, the Legislature required claimants to make application for a patent within five years from the application for survey, a survey and return of field notes, and certain assessment work. Upon the claimant's failure to meet those requirements the statute said his claims "shall be and are declared forfeited without judicial action of any kind * * *." Acts 1889, 21st Leg., ch. 100, pp. 116, 119. Unlike the act enacted two years previously concerning surface lands, in the case of minerals

there was no requirement for any endorsement upon the account, and the forfeiture of minerals resulted by operation of law. In 1905 the Legislature amended the law and provided that a locator's default in certain particulars meant that "the file and claim thereunder shall be void." One of the statutory reasons for the voidness of that kind of claim was the fact that "the first payment is not paid to the State Treasurer within sixty days" from the date of application. Under the 1905 Act the first payment was one-fifth of the purchase price. If the payment was made, however, the act provided that a subsequent default in interest or principal would be subject to forfeiture by the endorsement on the obligation of the word "forfeiture" signed by the Commissioner. Acts 1905, 29th Leg., ch. 99, p. 148. The Legislature evidenced an intent not only to treat mineral lands differently from other lands, but also to treat the first payment differently from subsequent payments.

In 1913 the Legislature repealed former laws and enacted a new law for the prospecting and development of minerals in public lands. Acts 1913, 33rd Leg., ch. 173, p. 409. Section 20 of the act required the Commissioner to endorse the claim "forfeited." At that time provision for forfeiture of mineral claims generally corresponded to that required for forfeiture of contracts to acquire other public lands. This method of forfeiture was carried forward by the 35th Legislature in Section 20 of its amendment to the law. Acts 1917, 35th Leg., ch. 83, pp. 158, 165. The 1917 Act recognized the need to treat certain minerals differently and accomplished this by creating groups or classifications of minerals. It separately provided for the prospecting for and development of oil and gas; coal, lignite, and sulphur; and other minerals. In 1919, the Legislature determined that minerals other than oil, gas, coal, and lignite were not subject to the same prospecting and developmental methods and enacted another separate law concerning them. Acts 1919,

36th Leg., ch. 79, p. 241. Significant changes were made in the previous law. The method of forfeiture was rather dramatically changed. The 1919 Act provided for an ipso facto termination of mining claims without any declaration or action of any kind by the Commissioner. Section 8 of the 1919 Act provided:

"Failure of the locator or owner of any claim or claims to comply with any provisions of this Act prior to receiving patent thereto, shall constitute an ipso facto forfeiture of all his rights in the claim, and the claim shall be open to location by others as prescribed in this Act, the same as if no location had ever been made."

In 1929 the Legislature amended the 1919 Act in order that the Commissioner might permit reinstatement of terminated claims within ninety days upon payment of all delinquent rentals and royalties. The amendment, however, left unchanged the provisions for an ipso facto forfeiture. Acts 1929, 41st Leg., ch. 291, p. 655. In 1934 the Legislature enacted what is presently Article 5397, the one under consideration in this case.[2] Acts 1934, 43rd Leg., 2nd C.S., ch. 20, p. 61.

 Article 5397 does not provide for an ipso facto termination of sulphur claims upon non-payment of rentals as earlier statutes had provided; on the other hand, it does not require stamping and signing the claim file as the only overt act by which the land "thereupon * * * shall be forfeited," as in Article 5326. The Commissioner's subjective intent to forfeit is not sufficient to effect a forfeiture, because it would afford no record of the forfeiture. At the time of the conference between Cobra's and the Commissioner's representatives in the Land Office on November 28, 1957, the Commissioner refused Cobra's tender of the rentals giving as his reason a statement that the

tender was not timely. On that same date a record was made of the forfeiture. The Commissioner's refusal to accept the rentals and the reason given Cobra's representative was a clear statement that Cobra's rights were terminated. The record was made confirming that fact. The Commissioner overtly informed Cobra and made a record of the forfeitures on the same date. We hold that this was an effective declaration of the forfeitures.

 Cobra's further contention is that the Commissioner had no discretion with respect to the decision of whether to accept or decline the tendered late rentals. The effect of Cobra's contention is that the Commissioner was compelled to accept the rentals despite the fact that the tender was untimely under the statute. The burden facing Cobra's position was expressed in Wortham v. Walker, Commissioner of General Land Office, 133 Tex. 255, 128 S.W.2d 1138 (1939). There we said the burden upon the relator is to show that its right "is so free from doubt and the duty of the officer so clear and free from any substantial question that an order should issue to compel performance." See Holcomb v. Robinson, 118 Tex. 395, 15 S.W.2d 1027, 1028 (1929). We recognize that contracts, such as those Cobra had with the state, are executory and that statutes which authorize a forfeiture are "to be treated as merely making provision for the exercise of the right of the state to rescind executory contracts of sale for the failure of purchasers to perform the conditions on which the continuance of their rights depend, and as conferring authority upon the officer of the state to act for it in effecting such rescission." Brightman v. Comanche County, 94 Tex. 599, 63 S.W. 857 (1901); Standifer v. Wilson, 93 Tex. 232, 54 S.W. 898 (1900); Fristoe v. Blum, 92 Tex. 76, 45 S.W. 998 (1898).

 It is our opinion, however, that the Commissioner's declaration of the

---

2. An amendment in 1935 changed the words in the last sentence of Article 5397 from "rights theretofore existing" to "rights thereto," but the change is not material to this case. Acts 1935, 44th Leg., p. 77, ch. 29, § 2.

forfeiture of Cobra's mineral claims was a decision within his discretion. It is our further opinion from our study of the history of Article 5397 that his discretion on the side of an acceptance of late rentals on contracts concerning the sulphur awards was more restricted than is the case with the acceptance of late rentals on contracts concerning other state lands.

Prior to the 1934 amendment of the 1919 mineral law, the Commissioner had no discretion about forfeiture, because non-payment of rentals worked an ipso facto termination of the claimant's rights. The enactment of Article 5397 ameliorated the strictness of the former law, but it did so with guarded language. We again find differences between Article 5397 and Article 5326 which show the Legislature's purpose. Article 5326 empowers the Commissioner to declare a forfeiture for late payments, but leaves open the matter of how late the payments should be before he acts. Article 5397, on the other hand, treats lateness in terms of thirty days. "If the locator * * * shall fail or refuse to make the payment of any sum within thirty days after it becomes due * * *." The legislative policy of limiting the duration of late payments to thirty days began in 1905. In that year the Legislature changed the pre-existing law by requiring locators to pay one-fifth of the price of the land within sixty days. Act 1905, 29th Leg., ch. 99, p. 148. Failure to make the payment voided the claim. Annual interest and principal, if not paid within thirty days of due date, did not void a claim, but made the claim subject to forfeiture. The emergency clause in the 1905 Act gave its reason for so shortening the time for late payment:

Section 3. "The fact that persons who file on mineral lands containing gold, silver, cinnabar, lead, tin and copper can work them for five years without paying anything to the fund to which the land belongs and then forfeit it without recourse by the State for what may have been taken out of it, and then the same claim may again be filed on and worked another five years without payment and so on indefinitely until a valuable mineral deposit may be exhausted to the detriment of the fund to which the land belongs creates an emergency * * *."

Protection of the State from exhaustion or loss of mineral resources was the object in stating a short period of grace for late payments. Since 1905 the policy of limiting the period of delinquency has been carried forward in all amendments and changes in the law. The purpose of the law is to require prompt compensation to the State. If the law permitted long periods of delinquency as to mineral land, it would be possible for claimants to enter upon lands, do extensive assessment and development work, and prove the claim was valueless. Under these circumstances the claimants would welcome a forfeiture by the State for non-payment. Forfeiture would be the only recourse to the uncompensated state even though the claimant's operations condemned the value of the minerals.

The Commissioner's discretion to accept late payments is in fact discouraged by the terms of Article 5397. The statute requires him to determine facts, i. e., a claim is subject to forfeiture. If so, the statute says "he shall forfeit the same when sufficiently informed of the facts which authorize the forfeiture, * * *." Similar language is not found in Articles 5326 (surface); 5350 (oil and gas); or 5421m, § 19 (Veterans Land Act).

■ We hold that Cobra, having paid the state nothing and being delinquent beyond the time the statute made its claims subject to forfeiture did not have an unequivocal legal right to require the Commissioner to accept its late tender of rentals. The Commissioner's forfeiture was an act of discretion in accord with the spirit of the statutes concerning mineral awards. Wortham v. Walker, 133 Tex. 255, 128 S.W.2d 1138, 1151 (1939); Holcomb v.

Robinson, 118 Tex. 395, 15 S.W.2d 1027 (1929).

Relator's petition for mandamus is denied.

GREENHILL, HAMILTON, REAVLEY and McGEE, JJ., dissent to this opinion.

## ON MOTION FOR REHEARING

POPE, Justice.

Relator's motion for rehearing is overruled. The scant record before this court consists essentially of an affidavit by Cobra, two affidavits by the Land Commissioner, and some affidavits concerning collateral matters. The two controlling affidavits are discussed in the original opinion. On motion for rehearing, Cobra has advanced a number of additional reasons in support of its prayer for a mandamus, but it has not produced proof that meets the settled standards required for our issuance of a writ of mandamus.

■■■ Cobra has the burden to demonstrate clearly and unequivocally its right to compel the Commissioner to perform a ministerial as distinguished from a discretionary act. "It is elementary law that mandamus will not issue to compel a public official to perform an official act unless it is made to appear to the court that the relator's right to have the act performed is clear." Williams v. Pitts, 151 Tex. 408, 251 S.W.2d 148 (1952); City of McAllen v. Daniel, 147 Tex. 62, 211 S.W.2d 944 (1948); Stanford v. Butler, 142 Tex. 692, 181 S.W.2d 269, 153 A.L.R. 1054 (1944); City of Galveston v. Mann, 135 Tex. 319, 143 S.W.2d 1028 (1940); Wortham v. Walker, 133 Tex. 255, 128 S.W.2d 1138, 1151 (1939); Texas National Guard Armory Board v. McCraw, 132 Tex. 613, 126 S.W.2d 627 (1939); Denison v. Sheppard, 122 Tex. 445, 60 S.W.2d 1031 (1933); Holcomb v. Robinson, 118 Tex. 395, 15 S.W.2d 1027 (1929); Common School District v. Keeling, 113 Tex. 523, 261 S.W.

364 (1924); Kemp v. Wilkinson, 113 Tex. 491, 259 S.W. 912 (1924); Trinity Life & Annuity Soc. v. Love, 102 Tex. 277, 115 S.W. 26, 116 S.W. 1139 (1909) Wortham v. Sullivan, 147 S.W. 702 (Tex.Civ.App. 1912, writ ref.).

■■■ "Mandamus is a writ which issues to require the execution of a matter whose merit is beyond dispute and it may not be employed as scales in which to balance the weight of evidence or bridge the gap between broken or disconnected facts." Wortham v. Walker, 133 Tex. 255, 128 S.W.2d 1138, 1151 (1939). Cobra has called upon this court to settle a disputed question concerning the fact of forfeiture which we shall not undertake to do in this original proceeding.

■■■ The Commissioner's affidavit states that all the Cobra awards "were declared forfeited on or before November 27, 1967," which was the day before Cobra says its tender was made. That statement is made as well as the one mentioned in the original opinion that all of the awards "had been declared forfeited by me prior to November 28, 1967 * * *." The only dispute about this time of forfeiture comes from Cobra's affidavit which attributes to a land office attorney the statement "that said awards had not been forfeited," on November 28. This state of the record means that there is a negative hearsay statement about forfeiture from a Land Office employee and an affirmative statement that there was a forfeiture by the Commissioner. To grant a writ on such a record would require this court to pass upon the weight and credibility of these opposite statements. In an appropriate hearing in which the statements could be enlarged, the statements may be reconciled by explanation of the terms used. We are unable to do that upon the record before us.

Cobra argues that we should disregard the Commissioner's statement because it is a mere conclusion. However, the statement upon which Cobra must rely is no

less a conclusion, and it is made by an employee whose authority to speak for and bind the Land Office is not disclosed. Cobra would bind the State by a statement of the Land Office employee, though the Commissioner disregarded the very statement and immediately refused the late tender by Cobra.

The Commissioner in his affidavit swore that "the awards had been *declared* forfeited by me prior to November 28, 1967" and "were *declared* forfeited on or before November 27, 1967." (Emphasis added). According to Black's Law Dictionary (4th ed. 1951), the word, "declare," means, "to make known, manifest, or clear"; "to signify, to show in any manner either by words or acts," "to publish; to uttter; to announce clearly some opinion or resolution." The word is illustrated by examples, such as to "declare" a dividend, or to "declare" a document as one's last will and testament. Webster's New International Dictionary (2d ed. 1954) gives as synonyms for the word "declare," such meanings as "announce, proclaim, promulgate." It says: "To declare is to make known explicitly and plainly, esp. in a formal and public manner * * *."

■ A forfeiture under Article 5397, as distinguished from forfeitures authorized by other statutes which prescribe or limit the way for effecting forfeitures, may be officially declared orally, when the oral declaration is followed by prompt action to make a permanent record of the declaration. In this case, Cobra's representative was in the Land Office on November 28, 1967, and was informed that its tender was refused because the tender was late. The Commissioner says that the record of the forfeiture was made on that same date.

, ■ The declaration of a forfeiture is a discretionary act; the act of recording the declaration is ministerial in nature. "Mandamus lies to enforce the performance of a non-discretionary act or duty and will issue only when the act or duty is ministerial in character." 37 Tex.Jur.2d,

Mandamus, Sec. 18; Lowe and Archer, Texas Practice, Injunctions and other Extraordinary Proceedings, Sec. 471; Shamrock Fuel & Oil Sales Co. v. Tunks, 416 S.W.2d 779 (Tex.Sup.1967); Turner v. Pruitt, 161 Tex. 532, 342 S.W.2d 422 (1961); Wortham v. Walker, 133 Tex. 255, 128 S.W.2d 1138, 1150, 1151 (1939). According to the Commissioner's affidavit, the awards had been declared forfeited prior to November 28, 1967, and on that date he was in the process of mechanically stamping and noting this declaration upon each award.

■ The duties of a county clerk or other recorder of public documents are ministerial in nature. Hollis v. Parkland Corporation, 120 Tex. 531, 40 S.W.2d 53 (1931); Turrentine v. Lasane, 389 S.W.2d 336 (Tex.Civ.App.1965). Once the Commissioner exercises his discretion by declaring a forfeiture under Article 5397, the matter of promptly making a public record of the act is ministerial. Cobra in this case, is in the position of asking this court to order the Commissioner to reverse a forfeiture order which was an exercise of his discretion.

Cobra's motion for rehearing presents new arguments in support of its prayer for a mandamus. It relies upon some cases which arose under different statutes, and upon other cases in which the proof was clear and unequivocal. However, the precedents relied upon afford no basis for our ordering a mandamus. In Fristoe v. Blum, 92 Tex. 76, 45 S.W. 998 (1898), the Commissioner exercised his discretion and declared a contract to purchase a section of land forfeited. The purchaser, who was delinquent on a single interest payment, (42 S.W. 656) challenged this exercise of discretion, but the Commissioner's decision was upheld. The mandamus was denied in that case. Underwood v. Robison, 109 Tex. 228, 204 S.W. 314 (1918) held that the 1913 mineral act did not authorize an ipso facto termination of a permit. The court held, under the relevant statutes, that a forfeiture or rescission required the

Commissioner to perform the overt act of writing "forfeiture" on the file. Again, the court upheld the Commissioner's discretionary act and the mandamus was denied. Island City Savings Bank v. Dowlearn, 94 Tex. 383, 60 S.W. 754 (1901) requires a close examination of the relevant dates. The Commissioner declared a forfeiture on January 20, 1892, for a purchaser's failure to make a timely payment. The payment was not due until April 1892. The case is not relevant to the problem in this case.

The record shows that Cobra has never paid anything to the State on its awards. Its tender was several months late. Under the law of rescission, upon which Cobra relies, a purchaser who has paid no part of the purchase money and has made no improvements on the property, has no equities that entitle him to defeat a rescission by the vendee. McBride v. Banguss, 65 Tex. 174 (1900); Smith v. Owen, 49 Tex.Civ. App. 51, 107 S.W. 929 (1908, writ ref.); 59 Tex.Jur.2d, Vendor and Purchaser, § 543.

In our opinion, the grant of a writ of mandamus in favor of Cobra against the Commissioner would require us to (1) ignore our former precedents, (2) decide a disputed fact question, (3) misplace the burden of proof upon the Commissioner to prove he had forfeited the awards, (4) require the Commissioner to reverse a discretionary declaration of forfeiture, and (5) rewrite Article 5397 by adding words that are contained in statutes that are irrelevant to this action.

We overrule the motion for rehearing. The parties will have fifteen days within which to file a second motion for rehearing.

SMITH, J. concurring.

GREENHILL, J., dissenting, joined by HAMILTON, REAVLEY and McGEE, JJ.

SMITH, Justice (concurring).

Originally, I did not agree with the Court's judgment in this cause; however, after further consideration, I have concluded that the Relator's motion for rehearing should be overruled for the following reasons:

Relator urges in its motion for rehearing that the law of rescission as applicable to ordinary contracts is controlling between the State as vendor and relator as vendee. Relator says that its tender, though late, avoided a rescission. In Duval Corporation v. Sadler, 407 S.W.2d 493 (Sup.Ct. 1966) this Court treated the statutory requirements for the purchase of mineral lands as a statutory offer by the State. We held that a purchaser's compliance with the several statutory conditions precedent is necessary before there can be an acceptance. Under this construction, money expended by relator for locating, posting and surveying (Arts. 5390–5393) mineral lands are not partial payment to the State for mineral awards. Those were costs to relator in its efforts to comply with the essential conditions precedent to its acceptance of the statutory offer of the mineral awards in question. In *Duval Corporation, supra,* we restated the settled principle that compliance with the statutory requirements is essential to the sale of mineral lands and that an award itself is not the sale. We said:

"* * * Articles 5388–5403 do not in any manner vest the Land Commissioner with authority to refuse to issue such awards, when the fact is, or when the Land Commissioner has ascertained the fact to be, that the applicant, Duval in this case, has factually done the things which the legislative offer of such statutes require. (Citing cases). In Pohle v. Robertson, [102 Tex. 274, 115 S. W. 1166] this Court said: 'The legal efficacy of a purchaser of school land comes from the law which gives effect to the taking of the steps by which it authorizes the acquisition of title, and not

from the consent of the officer to an application.' In Schneider, [Schneider v. Lipscomb County Nat'l Farm Loan Ass'n. 146 Tex. 66, 202 S.W.2d 832] this Court said that the *award* is not a sale. The sale is 'accomplished by the offer made by the State in the statute [in our case 5388–5403] which prescribes the terms and conditions of the sale, and by the acceptance of the offer by the intending purchaser in his taking the several steps for purchase as set out in the statute.' "

Article 7, Section 4 of the Texas Constitution says that Public School Lands "shall be sold." There must be a sale; otherwise, one collides with the constitutional prohibition of gifts of public lands. Wheeler v. Stanolind Oil & Gas Co., 151 Tex. 418, 252 S.W.2d 149 (1952); State v. Post, 106 Tex. 468, 169 S.W. 407 (1914), rev. 106 Tex. 500, 171 S.W. 707.

For these reasons, the failure to make an initial payment in the correct amount and on time has consistently been treated differently from a failure to make subsequent payments after an obligation arises on the part of the State. In Gracey v. Hendrix, 93 Tex. 26, 51 S.W. 846 (1899), an award was held void although a tender of an initial payment was accepted one day late. See, also, Fitzhugh v. Johnson, 105 Tex. 318, 148 S.W. 286 (1912); Wanke v. Foit, 80 Tex. 591, 16 S.W. 329 (1891); Rone v. Kuehn, 81 S.W.2d 194 (Tex. Civ.App., 1935, writ ref'd).

Relator made no tender of the initial payment within thirty days of the award nor until the lapse of more than four months in some instances and a lapse of almost six months in others. The Commissioner correctly treated relator's non-payment of even the initial payment as grounds to refuse the late tender. Relator had no contract with the State, for it had paid nothing to the State, and was under no obligation to do so. Relator is thus in the position of urging that the Commissioner was powerless to exercise his judgment

in refusing to accept a late tender, during which late period, relator says it had rights but no obligations and the State had obligations but no rights. In my opinion the awards delivered to Cobra had not arisen to the status of a sale, and the Commissioner was under no ministerial duty to accept the late tender.

GREENHILL, Justice (dissenting).

I respectfully dissent for reasons which might be headnoted as follows:

(1) Article 5397 simply authorizes the Land Commissioner as agent of the State to *rescind* the State's executory contract of sale with the owner of a mineral award upon the owner's default in the payment of rentals. Fristoe v. Blum, 92 Tex. 76, 45 S.W. 998 (1898); Island City Savings Bank v. Dowlearn, 94 Tex. 383 60 S.W. 754 (1901); Underwood v. Robison, 109 Tex. 228, 204 S.W. 314 (1918).

(2) In dealing with its land the State acts in a proprietary capacity and is subject to the same rules of law, including the principles applicable to rescission, as would be applied to private persons in similar circumstances. Fristoe v. Blum, *supra.*

(3) Under an executory contract for the sale of land, there must be an unequivocal act of rescission by the seller *before* tender by the defaulting purchaser to defeat *the right* of the latter to make good the default. Island City Savings Bank v. Dowlearn, *supra;* Tom and Wife v. Wollhoefer 61 Tex. 277 (1884); Albright v. Hoyt, Tex.Civ.App., 57 S.W.2d 342, writ ref. (1933).

The majority opinion correctly states that the Land Commissioner's subjective intent to forfeit Cobra's mineral awards, if he had any such intent, would have been ineffective because it would afford no record of the forfeiture. The majority opinion may consider the overt act of forfeiture to have been the stamping of Cobra's awards, the Commissioner's letter refusing

to accept the rentals, or his notification of forfeiture through a letter written Cobra a month after the rentals were tendered. But, whatever the overt act, it occurred *after* Cobra had tendered all rentals due.

I find nothing in the majority opinion or in respondent's affidavits disputing Cobra's assertion that *no act* of forfeiture took place prior to the tender of the rentals. If the majority's holding is based upon a contrary premise that is supported by anything in the record, an issue of fact is presented; and the proceeding should be dismissed because of this Court's want of jurisdiction to determine the issue.

The statute before this Court in Fristoe v. Blum, 92 Tex. 76, 45 S.W. 998 (1898) read as follows:

"'If upon the first day of August of any year the interest due on any obligation remains unpaid, the commissioner of the general land office *shall* indorse on such obligation "Land forfeited," and *shall* cause an entry to that effect to be made on the account kept with the purchaser, and thereupon said land *shall* be forfeited to the state without the necessity of re-entry or judicial ascertainment and *shall* revert to the particular fund to which it originally belonged and be resold under the provisions of this act or any future law.'" (92 Tex. 81–82, 45 S.W. at 1000).[1]

The Court first ruled that when the State deals with its lands "the same law applies to it as under like conditions governs the contracts of an individual." (92 Tex. 80, 45 S.W. 999.) The Court then held that the statute gave the Land Commissioner the authority to *rescind* rather than to forfeit, stating:

"The word 'forfeiture' is inaptly used in the statute. * * * This assertion of the paramount title in the state was no more a 'forfeiture' than it would have been if Bennick had bought the land from an individual who, for the same reasons,

declared a rescission of the sale." (92 Tex. at 85, 45 S.W. at 1002.)

In Island City Savings Bank v. Dowlearn, 94 Tex. 383, 60 S.W. 754 (1901), this Court held that the attempted forfeiture [rescission] by the Land Commissioner was invalid and then said:

"* * * The contract not being lawfully forfeited, *the rights of the plaintiffs remained intact, and they had the right to pay up the past-due interest and such penalties as were required by law.* The sale to the defendant was without authority on the part of the land commissioner and conferred no title on him." (94 Tex. at 389, 60 S.W. at 756.)

The statute considered by this Court in Underwood v. Robison, 109 Tex. 228, 204 S.W. 314 (1918) provided as follows:

"A failure to file either of the sworn statements herein provided for *and within the time specified,* or the filing of a statement untrue or false in material matters, or the failure to expend the sum named in a bona fide effort toward the development of the area or areas, *shall work a revocation of said permit and the termination of the rights of the owner.* Such termination shall be endorsed by the Commissioner of the General Land Office upon a duplicate copy of the permit retained in the General Land Office." (Acts 33rd Leg., R.S. 1913, Ch. 173, Sec. 7, pp. 411–412.)

That statute could more easily have been construed as providing for forfeiture in the true sense of the word than could Article 5397. The underscored language so reflects. Moreover, that statute had to do with the *mineral* estate. Nevertheless, this Court by reason of "The policy of our laws, as expressed in various earlier statutes relating to public lands, and as worked out and declared in several decisions of this court construing them" [109 Tex. 228, 204 S.W. 314] held that the statute merely allowed the Land Commissioner to *rescind* the contract and

---

1. All emphasis in this opinion is supplied unless otherwise indicated.

did not provide for a true forfeiture. It is submitted that the majority opinion ignores "The policy of our laws" that was honored in the *Underwood* case.

The majority opinion concedes "that contracts, such as those Cobra had with the state, are executory and that statutes which authorize a forfeiture are 'to be treated as merely making provision for the exercise of the right of the state to *rescind* executory contracts of sale for the failure of purchasers to perform the conditions on which the continuance of their rights depend, and as conferring authority upon the officer of the State to act for it in effecting such rescission.' " But the opinion nullifies this concession by holding that Article 5397 in some way *restricts* the Land Commissioner's authority to accept past due rentals. As I understand the majority opinion, it does so because (1) Article 5397 prescribes no procedure for evidencing the act of rescission; (2) there are other differences between Article 5309 and similar statutes that reflect legislative intent to *restrict* the Commissioner's authority to accept past due rentals on mineral awards; (3) the legislative history of Article 5397 itself shows legislative intent so to restrict the Commissioner's authority; (4) such restriction is necessary to protect the State against the loss of its mineral resources; and (5) Cobra has not shown that its right to a writ of mandamus is free from doubt. I disagree.

Before discussing in detail what to me are the fallacies in the reasoning of the majority opinion, I emphasize that the only issue presented is whether Article 5397 automatically and without any action on the part of the Land Commissioner terminates the State's executory contract with the owner of a mineral award if the latter fails to perform within the thirty day grace period or whether the contract remains in effect until the Land Commissioner acts. If the latter, then the statute simply allows the Land Commissioner to *rescind* the contract, and principles applicable to cases of *rescission must* be applied. Once it be admitted, as to me it must be admitted, that Article 5397 does not provide for *ipso facto* termination of the contract upon default by the purchaser of the award, Cobra is entitled to prevail.

No question of restricting the authority of the Land Commissioner to accept late payments is involved. If the contract automatically terminates upon the purchaser's default, the Land Commissioner has no discretion; and if the contract continues in effect until the Land Commissioner acts, then 'he does have discretion which he may exercise at any time *before* the purchaser cures the default.

That Article 5397 does not prescribe the procedure to be followed by the Land Commissioner in rescinding the State's executory contracts is irrelevant. It may be assumed, as does the majority, that the Commissioner may rescind in any manner that offers satisfactory record evidence thereof. But the question is not *how* the Commissioner must rescind in order to preclude the defaulting purchaser from making the default good. The issue is *when* the Commissioner must act in order to prevent the defaulting purchaser from making the default good.

The cases relied upon by Cobra, at least to me, clearly hold that the defaulting purchaser may make good the default at any time *prior* to an act of rescission by the Land Commissioner. Here Cobra's contracts had not been rescinded when the rental payments were tendered. Assuming with the majority that the Land Commissioner could have rescinded in different ways, the fact remains that he had done nothing to rescind prior to tender of the rentals. Therefore, Cobra had the absolute right to pay, and the Land Commissioner had no right to refuse to accept the tendered rentals.

Aside from the fact that Article 5397 prescribes no procedure to be followed by the Land Commissioner in rescinding, no distinction whatsoever can be drawn between that statute and the legislation involved in *Fristoe v. Blum* and like cases. The statutes before this Court in *Fristoe v. Blum*, *Island City Savings Bank v. Dowlearn* and

Underwood v. Robison have already been considered. Each fixed a definite deadline for performance by the purchaser; and each on its face was mandatory.

No distinction between Article 5397 and the other statutes can fairly be drawn because Article 5397 provides that the Commissioner shall forfeit "when sufficiently informed of the facts," whereas the other statutes contain no such language. The quoted language would seem to give the Commissioner more discretion than did the other statutes that on their face *ordered* the Land Commissioner to forfeit *forthwith*. If anything, the quoted language enlarges rather than restricts the discretion of the Land Commissioner.

To me the majority's conclusion that "the Commissioner's discretion to accept late payments is in fact *discouraged* by the terms of Article 5397" is untenable. The Commissioner's discretion to accept late payments could not be any more discouraged than it was by the language of the statutes before this Court in *Blum, Dowlearn* and *Underwood,*—statutes that provided that the Commissioner *shall* forfeit or *shall* terminate. That language is quite mandatory.

What is said above is applicable to the majority's statement that "The enactment of Article 5397 ameliorated the strictness of the former law, but it did so with *guarded* language." I am unable to find the "guarded language" the majority has in mind. There is nothing guarded about the language that the Commissioner *"shall* forfeit" the awards. Yet the same language was used in the statutes before this Court in *Blum, Dowlearn* and *Underwood,* all of which held that the Commissioner was given the same authority to rescind that a private individual would have in similar circumstances.

The majority opinion gets some comfort from the fact that Article 5326 "leaves open the matter of how late the payments should be before he acts," that is, before rescission. This feature is compared to the language in Article 5397 that "treats lateness in terms of thirty days." But the statutes involved in *Blum, Dowlearn* and the other cases relied upon by Cobra did *not* "[leave] open the matter of how late the payments should be before he acts." As already mentioned, those statutes provided deadlines for payment; and when the deadline passed without payment, the Land Commissioner could rescind.

Moreover, the statement that Article 5326 "leaves open the matter of how late the payments should be" before rescission is subject to challenge. The language that "If any portion of the interest on any sale should not be paid *when due,* the land shall be subject to forfeiture by the Commissioner," *etc.,* would seem to give the defaulting purchaser *no* grace period whatsoever. On its face, the statute imports that the Commissioner may forfeit [rescind] immediately after the State's purchaser fails to pay "the interest \* \* \* due."

Nor can I agree with the majority's statement that "It is our further opinion from our study of the *history* of Article 5397 that his discretion on the side of an acceptance of late rentals \* \* \* was more *restricted* than is the case with the acceptance of late rentals on contracts concerning other state lands." As originally enacted, Article 5397 provided for forfeiture *in the true sense.* No action by the Land Commissioner was required. The majority opinion so states.

When the 43rd Legislature amended Article 5397 in 1934, it made it plain that it intended to substitute for the harsh provisions of the statute the language of other statutes that gave the Land Commissioner the *discretion* to rescind the State's executory contract. Not only does the language of Article 5397 as amended so reflect; other provisions of the amendatory legislation likewise so prove. In this connection Sections 3 and 4 thereof read in part as follows:

"Sec. 3. Laws providing for payment of rental on mineral claims during the month of January, 1934, *are suspended* for a period of one year from the effective

date of this Act as provided in Section I hereof * * *"

"Sec. 4. The fact that an extraordinary financial emergency and depression exists within the State and elsewhere, *and that many citizens are about to lose their mining claims,* on which they had paid rentals for several years, and done valuable and expensive assessment work, due to their inability at this time to pay their rentals, and by reason thereof imminent danger exists whereby citizens may be subject to distressing losses and lose the accumulations of a life time, *and the fact that great and irreparable wrong and injury will be done by the State against its own citizens* unless immediate relief as aforesaid hereby be granted, create an emergency," *etc.* (Acts 43rd Leg., 2nd C.S.1934, Ch. 20, p. 62.)

The majority opinion states that "Protection of the State from exhaustion or loss of mineral resources was the object in stating a short period of grace for late payments." This is followed with the assertion that "if the law permitted long periods of delinquency as to mineral land, it would be possible for a claimant to enter upon lands, do extensive assessment and development work, and prove the claim was valueless." The issue of whether or not "a short period of grace" for late payments is desirable is irrelevant. The period of grace given by Article 5397 is thirty days. No period of grace was given by the statute involved in Fristoe v. Blum. The statute construed in the *Dowlearn* case provided two periods of grace. Other statutes of the kind under consideration here have allowed different grace periods.

The question here presented is what happens when the period of grace, whether long or short, has expired. Upon such expiration, is there a true forfeiture, or is the Land Commissioner given the discretion to rescind the contract? Under the uniform holdings of this Court, Article 5397 provides the latter instead of the former remedy. And under *Blum, Dowlearn, Underwood,* the defaulting purchaser may make

good the default *prior to* rescission by the Land Commissioner.

Presumably the Land Commissioner will perform his duty under Article 5397. If the payments are not made within the grace period, he will evaluate the facts and either rescind the contract or attempt through threat of rescission to induce the purchaser to perform.

The claimant will not be allowed "to enter upon lands, do extensive assessment and development work, and prove the claim was valueless" unless the Land Commissioner chooses so to allow. I suggest that it is not the function of this Court to provide safeguards for the State that the Legislature did not choose to provide when it amended Article 5397.

Any one of the statutes that gives the Land Commissioner discretion to rescind the State's executory contract for the sale of land upon default by the purchaser, instead of providing for a forfeiture in the true sense of that term, places the matter of protecting the interest of the State in the hands of the Land Commissioner. If the Legislature had intended to protect absolutely the State against the evils of "long periods of delinquency" as to mineral land, insofar as Article 5397 is concerned, it would never have amended that statute. It would have left it as it was, that is, as a statute providing for an *ipso facto* termination of the interest of the defaulting purchaser. Instead the Legislature chose to rely upon the discretion of the Land Commissioner, a discretion he may exercise *prior* to the purchaser's making good the default.

Finally, the majority's conclusion that Cobra's right to the writ is not free from doubt is based upon the majority's interpretation of Article 5397. Upon the basis of such construction, the majority overrules Cobra's contention "that the Commissioner had no discretion with respect to the decision of whether to accept or decline the tendered late rentals." Of course, if a matter concerning the Commissioner's

discretion to rescind *after* tender is presented, Cobra is not entitled to the writ because its right thereto is not free from doubt.

But when Article 5397 is properly interpreted, the Land Commissioner had no discretion *after* tender by Cobra. He had no more discretion than did the Land Commissioner in the *Dowlearn* case, where this Court held that "The contract not being lawfully forfeited, the rights of the plaintiffs remained intact, and *they had the right* to pay the past-due interest and such penalties as were required by law." (94 Tex. 389, 60 S.W. 756.)

Under Article 5397, when properly construed, if the owner of a mineral award is in default at the expiration of the thirty day grace period, the Land Commissioner has discretion either to rescind the executory contract or to allow it to remain in effect. Such discretion continues until the Commissioner takes appropriate action to rescind or until the defaulting purchaser *prior* to any appropriate action of rescission by the Commissioner makes good the default. The continuing right of the purchaser to make good the default is cut off by an appropriate act of rescission by the Land Commissioner. By the same token, the continuing right of the Commissioner to rescind, his discretion to do so, is terminated by action of the purchaser curing the default *prior* to rescission by the Commissioner.

### DISSENT TO THE CONCURRING OPINION

The concurring opinion of Mr. Justice Smith is on an entirely different basis from the opinion of Mr. Justice Pope, and it must be dealt with separately.

The position taken in the concurring opinion is that since Cobra failed to make the initial payment within the time prescribed, no contract of sale by the State was created; and hence there was no contract for Sadler to rescind or to forfeit. The period of delinquency is referred to as one during which Cobra "says it had rights but no obligations, and the State had obligations but no rights." In this connection it is stated that under Article 7, Section 4, of the Texas Constitution, there must be a sale; otherwise one collides with the constitutional prohibition against gifts of public lands.

This approach completely overlooks the fact that the legislature may put the State's lands to use prior to selling them; and then when Cobra received its awards, it acquired from the State not the title to the land subject thereto, but the right to mine the lands, a valuable right for which Cobra has expended approximately $12,000.

Consideration of the legislation here involved as originally enacted, Acts 36th Leg., 2nd C.S., 1919, Ch. 79, pp. 241–246, convinces me that the initial payment of rentals is not a condition precedent to the issuance of an award and the creation of rights and obligations between the State and the owner of an award. This legislation and the amendments thereto make it clear that it is the "owner" of a mineral award who is to pay the rental of 50¢ per acre, including in this connection the rental for the *first* year. This means that the payment of the first rental of 50¢ per acre is not a condition precedent to the issuance of an award. If so it could never be paid by the "owner" of an award. It would be paid by a "locator" or "applicant."

Since its enactment in 1919, the legislation before us has made a clear distinction between the locator of a mineral claim or an applicant therefor, and the "owner" thereof. Speaking broadly, the legislation provides that the staker of a claim is a "locator" or "applicant" until he receives a mineral award. Thereafter he is an "owner" of the claim.

For example, Sec. 3 of the statute as originally adopted (now Article 5390) provided how "The *locator* of any mining claim" shall post his claim. (Acts 36th Leg., 2nd C.S., 1919, pp. 241–242.) Sec. 4 (now Article 5391) required "The *locator*"

to file an application for survey with the county surveyor. (*Id.*, p. 242.)

But Sec. 6 (now Article 5394) provided that "*After* the *date* of an *award* the *owner* shall have the exclusive right to the possession," etc. (*Id.*, pp. 241–243.) Then Sec. 8 (now Article 5397) provided that "Failure of the *locator* or *owner* of any claim or claims to comply with any provisions of this Act," *etc.*, shall forfeit the claim. It also referred to "Any claim which shall have been forfeited by an locator or locators, owner or owners," etc. (*Id.*, pp. 243–244.) These references both to "locator" and to "owner" were accurate.

It follows that prior to the granting of a mineral award the staker of the claim is a "locator" or "applicant," whereas *after the issuance of the award* he is an "owner." This is conclusively proved by Article 5394 (Sec. 6 of the original legislation) which states that "After the *date* of an *award* the *owner* shall have the exclusive right to the possession," *etc.* The "locator" or the "applicant" becomes an "owner" after the award is issued to him.

Of course, the owner of a *claim* is to be distinguished from the owner of the *mineral estate.* The owner of a claim, that is, a claimant who has obtained a mineral award, has the right to possession of his claim and the right to work the claim. He is not, however, the owner of the mineral estate. He does not become such until the State concludes its sale of the minerals to him by issuing the patent provided for by Article 5398.

It follows that the payment of the *first* rental of 50¢ per acre is not a condition precedent to the granting of a mineral award by the land commissioner. If so, the payment would be made by a "locator" or "applicant" and not by an "owner." If the position of the concurring opinion be adopted, the "locator" cannot become an "owner" until after he pays the first rental. But if this be so, the first rental is paid not by the "owner" as required by Article 5395 but by the "locator"

or "applicant." That article says that *all* rental payments, including the *first*, are to be paid by an "owner." And, as has already been set out in considering the interpretation of Article 5395, my construction of that article, together with the 30-day grace period allowed by Article 5397, mean that if the first year's rental is paid during such grace period, it is paid by an "owner."

In support of the position that Article 5395 must be interpreted as requiring the payment of the first year's rental *in advance* of the issuance of a mineral award, the concurring opinion invokes Article 7, Section 4 of the State Constitution that requires public free school lands to be "sold." The concurring opinion asserts that if the owner of an award may work his claim prior to payment of any rental, there has been no sale as required by the Constitution. In this connection, it interprets Article 5395 and its companion articles as in no way obligating the owner of a mineral award to pay annual rental or to do anything else there prescribed. The claimed consequence is that unless the first year's rental be extracted in advance the legislation is unconstitutional in that the State has given away its minerals instead of having sold them.

While I have grave doubt as to the soundness of the contention that Articles 5388 et seq., place no firm obligations upon the locator of a mineral claim, it is unnecessary to decide that question. The position of the concurring opinion ignores the fact that the legislature may validly provide for utilization of the State's lands *prior* to the sale of such lands. The legislation here involved contemplates utilization of the mineral estate in the State's lands prior to the actual sale thereof, such utilization to be followed by a sale.

While the legislature is required by Section 7, Article 4 of the Constitution to sell public free school lands, the legislature has the absolute discretion to determine *when* a sale shall be made and the terms upon which the sale shall be made. Since there may be long delay in selling the lands the

legislature may, in its discretion, *utilize the lands for other purposes prior to sale.* For example, public free school lands that are not minerally classified may be leased for grazing purposes instead of sold. Smisson v. State, 71 Tex. 222, 9 S.W. 112 (1888); Reed v. Rogan, 94 Tex. 177, 59 S.W. 255 (1900).

Similarly, the legislature, instead of a sale of the mineral estate in public free school lands, may prior to such sale utilize it in other ways. See, for example, Acts 18th Leg., R.S.1883, Ch. 97, pp. 100–101; 9 Gammel's Laws, 406–407. That legislation provided that when a prospector or miner should discover any coal, iron, tin, et cetera, on public lands, he could stake his claim; have his claim surveyed; and file a copy of said survey, together with specimens of the ore taken from the mine, with the State Land Board. It further provided that "After the filing of such survey and specimens, the discoverer or his assigns shall work said mine for his own benefit and for the benefit of the fund to which said mine belongs, said fund to receive five per centum of the gross receipts from said mine * * *." There was no provision for the issuance of a patent to the prospector or miner.

In discussing the foregoing legislation, Chief Justice Phillips in Greene v. Robison, 109 Tex. 367, 378, 210 S.W. 498, 502 (1919), said:

"The mining Act of 1883, which has been once referred to, has an important bearing on this question. It was a contemporaneous Act with that of April 12, 1883, in which the reservation here relied upon by the relator and which likewise is the basis of the personal position of the Land Commissioner, was expressed. It was approved two days later. Each is to be construed in the light of the other. The subject matter of the mining Act was the minerals in the school and asylum lands. It was enacted to give beneficial effect to the reservation of those minerals expressed in the Act of April 12

and repeated as one of its own sections, by providing a method whereby they might be made of use to the State as well as individuals. The plan adopted *did not involve their sale, but provided for the granting of mining claims for the working of mines containing the minerals, upon a royalty basis.*"

It will be noted that Chapter 97 did not require the prospector to pay the State any cash or other consideration for the right to work his mine. The statute only required the prospector or miner *to share* the gross receipts of such mine with the State.

The act did not violate the requirements of Article 7, Section 4 of the Constitution, because no *sale* of the mineral estate was involved; no patent was ever to issue. As the Court stated, the act merely provided for the working of mines upon a royalty basis.

Another illustration is Chapter 100, Acts 21st Legislature, R.S.1889, pp. 116–120; 9 Gammel's Laws 1144–8. That act is quite similar to the legislation now before this Court. It provided for the staking of a mining claim; for the making of a survey thereof; and for the doing of annual development work in the minimum amount of $100.00. Further, it required that the locator "shall in addition to this amount of work, annually pay to the treasurer of the state the sum of fifty ($50) dollars on each and every claim filed upon, which amount shall be credited to the fund to which the land belongs upon which the claim is located." The statute did *not* require *advance* payment of any sum to the State.

But when the 1889 legislation got to the point of a "sale" of the State's minerals, that is, to the issuance of a patent, it did require *advance* payment of the cash consideration of $25.00 per acre.

The 1889 legislation was a *sales* act that contemplated much development work prior to the "sale." It did not require *advance* payment of the annual rental for the annual development work because at such point

there was no sale and hence no constitutional requirement that payment be made in advance. The constitutional requirement was met because prior to issuance of the patent, that is, prior to the conclusion of the sale, the entire consideration therefor had been received by the State.

Turning now to the legislation before the Court, it is apparent that such legislation, like the Act of 1889, is a "sales" act having two phases. Phase one involves the activity of the locator of a mining claim before any sale of the minerals by the State, that is, before the issuance of a patent. Such phase is in no way subject to the requirements of Section 7, Article 4 of the Constitution because during such phase no sale is concluded.

The second phase involves concluding the sale of the minerals to the owner of the mining claim, that is, the issuance of a patent to such owner. Here cash in advance is required; a sale is concluded. Article 7, Section 4 of the Constitution is applicable and its requirements are met.

In locating his claim (Article 5390); in making the survey (Articles 5391 and 5392); in obtaining his award (Article 5393); in the development of his claim (Article 5394); and in paying rental and royalty (Article 5395); the locator of the claim is acting under the terms and provisions of a sales act but prior to conclusion of the sale of the mineral estate to him by the State. Section 4, Article 7 of the Constitution is inapplicable. But when the locator of a mining claim seeks to conclude the sale by obtaining a patent thereon (Article 5398) cash in advance is required. The constitutional provision is applicable and its requirements are met.

To my mind, Luckel v. Phillips Petroleum Co., Tex.Com.App., 243 S.W. 1068 (1922), is in point. There the Court had to consider the old Mineral Permit Act that allowed the Land Commissioner to issue permits to prospect state lands for oil and gas. In considering such a permit, the Court said,

"The permit only entitled the owners or applicant to prospect for and develop petroleum and natural gas. It did not confer upon them a right to such minerals. It was not even a lease of the land, but only a basis for obtaining a lease thereon. It was a merely optional right to acquire an interest in the land, equitable in its nature, and the only interest purchased by Roeser or the Phillips Petroleum Company was equitable. National Oil & Pipe Line Co. et al. v. Teel et al., 95 Tex. 587, 68 S.W. 979." 243 S.W. 1068–1069.

Here the mineral awards only entitled Cobra to mine the lands subject thereto. The awards gave Cobra no interest in the mineral estate but only the right to obtain such interest upon meeting certain requirements.

In my opinion the writ of mandamus should issue.

HAMILTON, REAVLEY and McGEE, JJ., join in this dissent.