IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-92-435-CV





AMARILLO INDEPENDENT SCHOOL DISTRICT,



 APPELLANT


vs.





LIONEL R. MENO, THE STATE COMMISSIONER OF EDUCATION


IN HIS OFFICIAL CAPACITY, AND THE TEXAS EDUCATION AGENCY, ET AL.,



 APPELLEES




 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT



NO. 91-14992, HONORABLE PAUL R. DAVIS, JUDGE PRESIDING



 





 The Amarillo Independent School District (AISD) appeals from a trial-court
judgment affirming an order of Lionel R. Meno, Commissioner of Education. We will reverse
the order and the judgment and remand the cause to the trial court with instruction that it be
remanded to the Commissioner for proceedings not inconsistent with our opinion.



THE CONTROVERSY



 The controversy arises under The Term Contract Nonrenewal Act (the "Act"), Tex.
Educ. Code Ann. §§ 21.201-.211 (West 1987 & Supp. 1993). We have set out in a footnote the
material parts of the Act.[1]

 In March 1989, AISD faced the prospect of reduced revenues for the new school
year that would begin September 1, 1989. To accommodate the reduced revenues, the board of
trustees determined not to engage for the new school year a large number of teachers employed
under expiring term contracts. 

 Section 21.202 of the Act directs, however, that local boards of trustees consider
"periodic written evaluations of each teacher" before deciding "not to renew the term contract of
any teacher." In addition, section 21.204(a) of the Act declares that these written evaluations
must be considered by the local boards before they decide to propose nonrenewal of a teacher's
contract and before they send notices to affected teachers. Section 21.204(a) also imposes an
April 1 deadline for such notification.

 Under AISD policy, written evaluations of teachers were not required to be
completed until June 15 of each year. Faced with the April 1 deadline and incomplete evaluations
for the school year 1988-1989, the AISD board considered, for purposes of section 21.204(a), the
latest available teacher evaluations--those for the school year 1987-1988. Among others, AISD
notified Henry Crawford, Suzanne Phillips, Gloria Roberts, Pauline Webb, George Howle, and
Ronald Gray that the board proposed not to renew their expiring term contracts.[2] Each teacher
requested a hearing before the board. After hearing, the board decided in each instance not to
renew the teacher's contract after considering, for purposes of section 21.202, his or her
evaluation for the school year 1987-1988. The board did not consider written evaluations for the
school year 1988-1989 because these evaluations had not been completed. Each teacher appealed
to the Commissioner as authorized by section 21.207 of the Act.



THE COMMISSIONER'S DECISION


 After consolidating the six appeals, the Commissioner reversed the AISD decision
in each instance, ordering that each teacher be reinstated in the same professional capacity for the
succeeding school year. The Commissioner's order declares the theory upon which he acted: The
AISD decisions were arbitrary and capricious because (1) sections 21.202 and 21.204(a) of the
Act required that the AISD board consider "current year written evaluations" before deciding not
to renew a teacher's term contract, and (2) the board failed to consider "current year" evaluations
before making its decisions in the six cases. The latter proposition is undisputed; the first is
highly disputed.

 There is no explicit "current year" requirement in the text of the Act. If it exists
at all, it is only by reason of an implication springing from the statutory text. We should therefore
explain the derivation of the Commissioner's "current year" requirement.

 The parties have furnished us copies of orders issued by the Commissioner in
deciding similar appeals to him under section 21.207 of the Act. The parties do not dispute the
accuracy of these copies. In an appeal to the Commissioner styled Barizon v. Midland
Independent School District, he ruled in 1988 that the nonrenewal decision of a local school board
rested on an adequate basis when the board considered (1) a written evaluation for the preceding
school year coupled with (2) sworn testimony about the teacher's current-year performance given
by two individuals who would prepare the written evaluation when it became due. The
Commissioner expressly overruled the Barizon holding in his 1991 decision in an appeal styled
Kelly v. Blooming Grove Independent School District. He reasoned in Kelly that the legislature
intended that the Act "provide teachers . . . advance notice of perceived deficiencies that might
well form the basis of a nonrenewal recommendation." To assure that teachers receive such
notice, the Commissioner engrafted upon sections 21.202 and 21.204(a) a general policy
requirement that local school boards must employ "current year written evaluations" in their
administration of the Act.

 In the case now before us, the Commissioner did not attempt an exercise of
statutory construction regarding the Act. He simply enforced Kelly, noting that he had previously
"decided and decreed" that sections 21.202 and 21.204(a) require "current year written
evaluations" and this requirement "is dispositive of these [six] appeals."

 We believe the Commissioner properly drew from the notice requirements of the
Act (sections 21.204(a) and 21.205) an inference that they implied meaningful notice. The
qualification of "meaningful" notice is an essential aspect of due process of law. See Madden v.
Texas Bd. of Chiropractic Examiners, 663 S.W.2d 622, 625-27 (Tex. App.--Austin 1984, writ
ref'd n.r.e.). But the Commissioner's order in the present case does not rest upon the proposition
that AISD failed to give any of the six teachers meaningful notice.

 Instead, the Commissioner's order reveals that his decision rests on the idea that
his "current year" evaluation requirement, adopted in Kelly, is a requirement of general
applicability having binding force in and of itself, irrespective of whether there has been a want
of meaningful notice in any particular case. That is to say, the mere failure of AISD to employ
"current year" evaluations in its administration of the Act is sufficient reason for reversing the
decisions in the six cases because it is tantamount to a violation of sections 21.202 and 21.204(a)
as the Commissioner has construed them; whether a teacher actually received meaningful notice
in any particular instance is immaterial. 

 It is one thing, however, to infer correctly that the Act requires meaningful notice
and quite another to enforce that meaning by a requirement of general applicability as the
Commissioner has purported to do, a distinction we now address.



DISCUSSION AND HOLDINGS


 From the trial-court judgment affirming the Commissioner's order, AISD brings
eight points of error complaining the Commissioner erroneously construed the Act, exceeded his
statutory authority, and rendered a decision that was arbitrary and capricious. See Texas
Administrative Procedure and Texas Register Act, Tex. Rev. Civ. Stat. Ann. art. 6252-13a,
§ 19(e)(1), (2), (6) (West Supp. 1993) (APTRA). AISD brings an additional point of error
complaining of the trial court's failure to make findings of fact and conclusions of law.

 Construction of the Act and the Limits of the Commissioner's Authority. These
complaints are interrelated; we shall discuss them together.

 The "cardinal rule" of statutory construction is to seek out the legislative intent
from a general view of the whole enactment; once that has been ascertained, one must assign
meaning accordingly to any questioned part of the statute.[3] In the process, one must give the
words of the Act an interpretation that is neither forced, nor strained, nor exaggerated. One must
assign the words a meaning suggested affirmatively by the statutory text and one that the text will
fairly sanction and clearly sustain.[4] A statutory text may carry implications, of course, but one
may impute an implication to the Act only if one is able fairly to conclude from the text that the
legislature obviously intended the thing implied. One is forbidden to impute an implication to the
Act if a legislative intention, excluding the implication, may be gathered from a reasonable
interpretation of the statute as it is written.[5]

 When one takes a general view of the Act as a whole, one finds its central idea to
be crystal clear--the legislature placed administration of the Act almost exclusively in the hands of
local school boards and not in the hands of state-level school officials, such as the Commissioner. 
For example, the Act directs that each local school board establish (1) the substantive "reasons"
or grounds upon which the board may decline to renew a term contract, (2) "policies and
procedures for receiving recommendations" from school administrators regarding nonrenewals,
and (3) rules governing the hearings that must be held before a nonrenewal decision is made--all
as set out in sections 21.203(a), (c) and 21.205(b).

 The Act itself contains no words suggesting affirmatively the Commissioner's
"current year" requirement. Section 21.202 declares simply that local school boards must require
a "periodic written evaluation of each teacher . . . at annual or more frequent intervals," which
evaluation the board is obliged to consider "prior to any decision . . . not to renew the term
contract of [the] teacher." Section 21.204(a) requires that these written evaluations also be
considered by the local school board before it decides to propose nonrenewal of a teacher's term
contract in a notice given the teacher affected. From these provisions, in context, it is
unreasonable to infer that the legislature obviously intended the Commissioner's "current year"
requirement. The opposite legislative intention is obvious: the legislature intended the timing and
frequency of the evaluations to be a matter of local policy choices, and this is a reasonable
inference of legislative intention that does not require the implication that the Commissioner must
attribute to the Act. For these reasons, the Commissioner's interpretation of the Act violates each
of the applicable rules of statutory construction listed above.[6] More importantly, perhaps, the
legislature chose in the Act to place almost all aspects of its administration in the hands of local
school boards, including the adoption of policies, procedures, and rules that these boards deemed
necessary. This impliedly excludes the establishment of policies, procedures, and rules by state-level school officials, so far as administration of the Act is concerned. Because the legislature
prescribed the method of administration, that method must be employed exclusively. Cobra Oil
& Gas Corp. v. Sadler, 447 S.W.2d 887, 892 (Tex. 1969).

 The Act establishes a single exception to the general proposition that it assigns
exclusive authority and discretion to local school boards in matters of administration. The single
exception is found in section 21.207 of the Act. This section assigns the Commissioner an
adjudicatory function in deciding administrative appeals taken to him from the decisions of local
school boards in particular cases; he may substitute his own decision in a case when he finds the
local board decision to be "arbitrary, capricious, unlawful, or not supported by substantial
evidence." § 21.207. Neither the Commissioner nor anyone else has suggested that his
adjudicatory power under section 21.207 is inadequate for the revision of a local-board decision
when it is made to appear in a particular case that a teacher did not receive meaningful notice,
and the section is adequate for that purpose on its face. This is not, therefore, a case where the
Commissioner's exercise of his expressly assigned function and power requires, by necessary
implication, another power. See Key Western Life Ins. Co. v. State Bd. of Ins., 350 S.W.2d 839
(Tex. 1961) (power to withdraw approval of policy form on specified statutory grounds may not
be extended by implication to permit agency to withdraw approval on another ground); Stauffer
v. City of San Antonio, 344 S.W.2d 158 (Tex. 1961) (power to ascertain physical and mental
fitness not impliedly given City by statute entitling firefighters to re-employment by City if
physically and mentally fit after military leave); Massachusetts v. United N. & S. Dev. Co., 168
S.W.2d 226 (Tex. 1942) (statute requiring two sureties on bond, each liable for twice amount of
debt secured, may not be altered by implication to permit two sureties undertaking disparate
obligations even though debt is twice secured); Humble Oil & Refining Co. v. Railroad Comm'n,
128 S.W.2d 9 (Tex. 1939) (power to fix certain prices of natural gas not implied by numerous
statutory powers for regulation of other aspects of natural gas business); Commercial Standard
Ins. Co. v. Board of Ins. Comm'rs, 34 S.W.2d 343 (Tex. Civ. App.--Austin 1930, writ ref'd)
(power to fix certain insurance sales commissions not implied by numerous statutory powers for
regulation of other aspects of insurance business).

 By prescribing and enforcing his requirement of general applicability--his policy that
sections 21.202 and 21.204(a) require "current year" evaluations in the administration of the
Act--the Commissioner has attempted, in effect, to overrule policies promulgated by the legislature
and the State Board of Education.[7] As mentioned above, the legislature chose, in sections
21.203(a), (c) and 21.205(b), to place in local school boards the power to establish matters of
policy and procedure in administering the Act. Exercising this power delegated by the legislature,
the AISD school board established a written policy that made teacher evaluations due June 15 of
each year. When confronted with this AISD policy choice, and the fact that "current year"
evaluations were thus not available for AISD consideration in the six appeals before him, the
Commissioner merely recited in his final order that the policy was only a "local policy and . . .
a date that can be changed" by the AISD board to conform with the Commissioner's contrary
policy that "current year" evaluations must be employed in administering the Act. In other words,
the Commissioner purported to compel revision of the policy choice that the legislature itself
authorized the AISD board to make in its discretion.

 The Commissioner did much the same with regard to a discretionary choice given
AISD by the State Board of Education, the policy- and rule-making component of the Central
Education Agency. In a formal rule, the State Board of Education adopted the policy that local
school districts may elect to employ the same written evaluations for purposes of administering
both the Act and the "career ladder" statutory scheme found in sections 13.301-.323 of the
Education Code.[8] Tex. Educ. Code Ann. §§ 13.301-.323 (West Supp. 1993); 19 Tex. Admin.
Code § 149.41(b) (1992). Exercising the right of election given it by the State Board of
Education, AISD chose as a matter of policy to use the same evaluations for both purposes. See
19 Tex. Admin. Code § 149.71(c)(2), (3), (4) (1992). This choice necessitated a deadline after
April 1. As a result, the written evaluations were not yet due and available, in the six cases
involved in this appeal, for compliance with the Commissioner's "current year" theory. When
confronted with AISD's rule-based discretionary choice, and its affect on compliance with the
Commissioner's theory, the Commissioner merely remarked in his final order that the AISD was
not required to use the same written evaluations. The district could have declined to employ the
same written evaluations for administering the two statutory schemes; hence, by its own actions,
AISD had simply "placed upon itself a burden that would keep the district from complying with
the statutory dictates" of sections 21.202 and 21.204(a) as the Commissioner construed them. In
other words, the Commissioner, in effect, nullified the school district's choice, made under a right
of election given expressly by the State Board of Education in its formal rule.

 For the foregoing reasons, we hold the Commissioner erred as a matter of law in
the construction he placed upon the Act with regard to his policy of "current year" evaluations and
exceeded his statutory authority by imposing that policy as a general requirement to be obeyed
by local school districts in their administrations of the Act. See APTRA § 19(e)(1), (2). We
therefore sustain AISD's first, second, and third points of error, and that part of the fourth point
of error directed to the Commissioner's exceeding his authority.

 Abuse of Discretion. We will assume, for purposes of the discussion only, that the
Commissioner properly interpreted the Act and that he possessed the power to impose his "current
year" policy on local school districts as a requirement of general applicability. Even so, he was
prohibited to exercise his power in an arbitrary fashion, and we are obliged to set aside his order
if it issued from an abuse of his discretion. See APTRA § 19(e)(6); Tex. Educ. Code Ann. §
11.13 (West 1991).

 When an administrative agency implements new requirements of general
applicability, it ordinarily does so through formal rule-making procedures such as those set out
in APTRA §§ 4-10. This course assures fairness to affected persons because rule making operates
prospectively from the effective date of the new rule. It also assures, by the notice-and-comment
provisions of APTRA §§ 4-10, that the public and affected persons are heard on matters that
involve their interests and affairs. This incidentally enables the agency to acquire the large view
necessary to the adoption of requirements of general applicability such as standards of conduct and
administration. The legislature delegates rule-making power to an agency in the expectation that
it will ordinarily employ that power to formulate and adopt requirements of general applicability;
a presumption favors this course of proceeding. See 1 Frank E. Cooper, State Administrative Law
177-85 (1965).

 Nevertheless, exceptional cases do arise in which the agency may justifiably
choose, in its discretion, to formulate and enforce a general requirement through its decision in
a particular case coming before the agency, in lieu of developing and adopting the requirement
through formal rule making under APTRA §§ 4-10. This course may be justified, for example,
when the agency is faced with construing a new rule or statute, or when it deals with a problem
that requires ad hoc resolution simply because the problem cannot be captured within the bounds
of a general rule. See generally 1 Cooper, supra; Ron Beal, Ad Hoc Rulemaking: Texas Style,
41 Baylor L. Rev. 101 (1989). The agency's discretionary choice to rely upon ad hoc
enforcement of the general requirement is, however, subject to judicial review and revision. See,
e.g., Texas State Bd. of Pharmacy v. Seely, 764 S.W.2d 806 (Tex. App.--Austin 1988, writ
denied); Southwestern Bell Tel. Co. v. Public Util. Comm'n, 745 S.W.2d 918 (Tex. App.--Austin
1988, writ denied); Madden, 663 S.W.2d 622.

 In the present cause, we see nothing to negate the presumption in favor of the
fairness and public participation that attend formal rule making under APTRA §§ 4-10. The issue
was not a new one for the Commissioner; he had himself adopted contrary policies and
requirements in the space of four years, first in Barizon then in Kelly. The issue did not present
a problem impossible of capture within the boundaries of a general rule; the Commissioner
adopted and enforced a general rule by his "current year" policy.

 On the other hand, the deleterious effects of an ad hoc enforcement of the general
requirement were and are obvious. In the present cause, for example, AISD's reliance on the
previous-year evaluations was permissible under Barizon at the time the district decided the six
cases. The Commissioner's decision in Kelly intervened, and he applied it retroactively to reverse
the AISD decisions when the six administrative appeals came before him. Since the State Board
of Education, unlike a court, has



the ability to make new law prospectively through the exercise of its rule-making
powers, it has less reason to rely upon ad hoc adjudication to formulate new
standards of conduct within the framework of [the pertinent legislation]. The
function of filling in the interstices of the [legislation] should be performed, as
much as possible, through this quasi-legislative promulgation of rules to be applied
in the future.



Securities & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 202 (1947). Quite apart from the
problem of retroactivity, however, the hundreds of school districts affected by the Commissioner's
"current year" requirement and the public at large have been denied, without justification, the
opportunity and benefits afforded by the notice-and-comment provisions of formal rule making
under APTRA §§ 4-10.

 We hold, as a result, that the Commissioner abused his discretion by choosing to
enforce the "current year" requirement on an ad hoc basis rather than through formal rule
promulgated by the State Board of Education.[9] The remaining part of AISD's fourth point of
error directed to the Commissioner's abuse of discretion and AISD's points of error five through
eight are sustained. We need not reach AISD's ninth point of error because of our disposition of
the preceding points of error.

 For the reasons given, we reverse the Commissioner's final order and the trial-court
judgment, remanding the cause to the trial court with instruction that it be remanded to the
Commissioner for proceedings not inconsistent with our opinion.



 

 John Powers, Justice

[Before Justices Powers, Kidd and B. A. Smith]

Reversed and Remanded with Instructions

Filed: May 12, 1993

[Publish]

ENDNOTES




[1] We have supplied the emphasis in the following quotations from the Act:


 § 21.202. Teacher Evaluations


 The board of trustees . . . shall provide by written policy for the periodic written evaluation
of each teacher in its employ at annual or more frequent intervals. Such evaluation shall be
considered by the board of trustees prior to any decision by the board not to renew the term
contract of any teacher.


 § 21.203. Nonrenewal of Term Contracts


 (a) The board of trustees of each school district may choose not to renew the
employment of any teacher employed under a term contract effective at the end
of the contract period.


 (b) The board of trustees . . . shall establish policies consistent with this subchapter
which shall establish reasons for nonrenewal. . . .


 (c) The board of trustees . . . shall establish policies and procedures for receiving
recommendations from its school administration for the nonrenewal of teacher
term contracts . . . .


 § 21.204. Notice


 (a) In the event the board of trustees receives a recommendation for nonrenewal, the
board, after consideration of the written evaluations required by Section 21.202
. . . and the reasons for the recommendation, shall, in its sole discretion, either
reject the recommendation or shall give the teacher written notice of the proposed
nonrenewal on or before April 1 preceding the end of the employment term fixed
in the contract.


 § 21.205. Hearing


 (a) If the teacher desires a hearing after receiving notice [the hearing shall be held
within 15 days of the teacher's request and shall be closed unless the teacher
requests an open hearing].


 (b) The hearing shall be conducted in accordance with rules promulgated by the
district. The board of trustees may designate a person to serve as an impartial
hearing officer to develop a record for consideration by the board. The board
shall make its decision based on a review of the record developed by the impartial
hearing officer and on oral argument before the board [by] the teacher or the
teacher's representative and the district's representative. [Only the first sentence
of this subsection was in effect at the time of the board hearings in the present
appeal].


 § 21.206. Decision of the Board


 [The board shall take such action as it deems lawful and appropriate and notify the
employee in writing of its decision within 15 days].



ENDNOTES (Cont'd.)




[1] Continued:


 § 21.207. Appeal


 (a) If the teacher is aggrieved by the decision of the board of trustees, he may appeal
to the State Commissioner of Education pursuant to Section 11.13 of this code. 
The commissioner may not substitute his judgment for that of the board of
trustees, unless the decision below was arbitrary, capricious, unlawful, or not
supported by substantial evidence.


 (b) Either party may appeal the commissioner's decision to a district court in Travis
County.


[2] Each of the six teachers is an appellee in the present appeal, as are the Commissioner and the
Texas Education Agency.


[3] Citizens Bank v. First State Bank, 580 S.W.2d 344, 348 (Tex. 1979).


[4] Railroad Comm'n v. Miller, 434 S.W.2d 670, 672 (Tex. 1968).


[5] Massachusetts v. United N. & S. Dev. Co., 168 S.W.2d 226, 229 (Tex. 1942); Sexton v.
Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 138 (Tex. App.--Austin 1986, writ ref'd
n.r.e.).


[6] See supra notes 3-5 and accompanying text.


 It is hardly necessary to add that the Commissioner's construction of the Act is not binding
on a reviewing court; it lies within the judicial power, not the executive power, to say with
final authority what a statute means. But, of course, the Commissioner is required almost
daily to interpret the statutes administered by the Central Education Agency. However, if a
particular statute is unambiguous, as in the present case, a reviewing court owes no deference
to the Commissioner's interpretation. The expressed will of the legislature must be enforced. 
On the other hand, in the case of an ambiguous statute, the Commissioner's interpretation
would be entitled to deference in light of the Commissioner's experience with the statute and
the necessity that he will have to enforce it in the administrative sphere. See generally
Stanford v. Butler, 181 S.W.2d 269, 273 (Tex. 1944). The degree of deference is
characterized variously by such terms as "respect," "proper weight," or "great weight." 
Courts ordinarily adopt an agency interpretation of an ambiguous statute provided it is a
reasonable interpretation and one in harmony with other statutes and rules. The degree of
deference may become particularly great when an agency interpretation is one of long
standing and uniform application. Id.


[7] We here set out in context a summary of the Commissioner's duties and powers within the
Central Education Agency, as set out in the Education Code enacted by the legislature.


 Generally speaking, public education is a function committed to the legislature in Tex. Const.
art. VII, § 1. The relevant statutes are found in the Education Code, dealing in some detail
with all aspects of school affairs.


 The statutes establish a basic division for the government of public education, a division
between government and financing at the state level and at a local level, the latter being
effectuated through local school districts, in the present case an "independent school district."


ENDNOTES (Cont'd.)




[7] Continued:

 

 The state agency for the government of public education is the Central Education Agency,
a body of limited and delegated powers (although they are broadly expressed in some
instances). All other powers of school government are vested by the legislature in the boards
of trustees of the numerous school districts within the state. Tex. Educ. Code Ann. § 11.01
(West 1991). The Central Education Agency is composed, in turn, of four entities, as
follows:


 (a) The State Board of Education. This component is charged to formulate policies through
rules for the purpose of "carrying out the duties" that the legislature by statute places upon
the Board or the Central Education Agency as a whole. Id. § 11.2101 (West Supp. 1993),
§ 11.24 (West 1991).


 (b) The State Board of Vocational Education. This body is composed of members of the
State Board of Education when they act in matters pertaining to vocational education. Id.
§ 11.24(b) (West 1991). It is not necessary here to discuss further aspects of this component. 



 (c) The State Department of Education. This body constitutes the professional, technical, and
clerical staff of the Central Education Agency. Id. § 11.61 (West 1991).


 (d) The Commissioner of Education. The Code assigns numerous executive duties to the
Commissioner. They include the following:


 (1) The general duty of executing the school laws and the rules and regulations
promulgated by the State Board of Education. Id. § 11.25(a) (West 1991).


 (2) The power to interpret the rules and regulations of the State Board of Education, the
Commissioner's interpretations being "binding for observance on all officers and
teachers." Id. § 11.52(l) (West 1991).


 (3) The performance of adjudicative functions, together with the State Board of
Education, in deciding appeals from local school districts. Id. § 11.13(a), (b) (West
1991); see also § 21.207 (West 1987) (relating to appeals to the Commissioner under
The Term Contract Renewal Act).


 As an example of that part of school government allocated to local school districts, such as
the Amarillo Independent School District involved in the present case, we may refer to
chapter 23 of the Education Code. An independent school district is a "body corporate,"
governed by its board of trustees. It has, among others, the following powers and duties:


 (a) The "exclusive power to manage and govern the public free schools of the district." Tex.
Educ. Code Ann. § 23.26(b) (West 1987).


 (b) The power to "adopt such rules, regulations, and by-laws as they may deem proper." Id.
§ 23.26(d).


 (c) Such other powers and duties as may be granted or imposed by the Education Code or
other provisions of law. Id. § 23.25.


 (d) The power to contract with superintendents, principals, teachers, and other officers. Id.
§ 23.28(a).


ENDNOTES (Cont'd.)



[7] Continued:


 (e) The power to require the teaching of courses in addition to those required by the
Education Code. Id. § 21.101(e).


 (f) The power to carry out all educational functions "not specifically delegated to the Central
Education Agency." Tex. Educ. Code Ann. § 11.01 (West 1991). Thus, the Central
Education Agency is a body exercising general control over specifically delegated functions
while independent school districts exercise residual control over all other educational
functions.


[8] The "career ladder" scheme bears upon the present cause in another way as well. It affords
a comparison between the legislature's choice to place administration of a statute in the hands
of local school districts and its choice to place administration in the hands of state-level school
officials.


 The "career ladder" scheme provides for the augmentation of teacher pay according to the
"step" of the "ladder" to which a teacher is assigned by the local school district, based upon
performance evaluations. Tex. Educ. Code Ann. §§ 13.301-.323 (West Supp. 1993). In
contrast to the Act, which directs local school boards to provide the policies and procedures
necessary for administration, sections 13.302 and 13.304 of the Code direct that the State
Board of Education "adopt an appraisal process and criteria" to measure teacher performance
and "develop or adopt and validate an assessment instrument" for appraising teacher
performance in five categories specified by the legislature. Id. §§ 13.302(a), .302(d), .304. 
Local school districts may, if they so elect, employ the same evaluations for purposes of The
Term Contract Nonrenewal Act. 19 Tex. Admin. Code § 149.41(b) (1992).


 The "Local Role"--the role of local school districts--is quite limited in the "career ladder"
scheme. Such districts use "the appraisal process and performance criteria developed by" the
State Board of Education, appraising teachers one or more times each year, depending on
each teacher's status and performance as measured by "the most recent appraisal." Tex.
Educ. Code Ann. § 13.303(c)(2) (West Supp. 1993). The "career ladder" decisions of local
school boards may be the subject of an administrative appeal to the Commissioner. Id.
§ 11.13 (West 1991).


 Consistent with the legislature's decision to place administration of the "career ladder"
scheme in state-level education officials, the State Board of Education has quite properly
adopted formal rules regulating in detail the administration of that statutory scheme. Among
other things, interestingly enough, the State Board of Education has by rule required that
local school districts employ "current school year performance evaluations" in specified
circumstances. 19 Tex. Admin. Code § 149.71(c)(2), (3), (4) (1992). This is, of course, the
identical requirement that the Commissioner has attempted to place upon local school districts
by means other than a formal rule--by his purported interpretation of the Act.


 In contrast, however, the State Board of Education--the policy-making and rule-making
component of the Central Education Agency--has not attempted to regulate in detail, by formal
rule, the administration of the Act by local school districts. The State Board of Education
has, by formal rule, regulated in detail administrative appeals to the Commissioner, his
adjudicatory function being the sole function committed to a state-level school official under
the Act. See 19 Tex. Admin. Code § 157.64 (1992).


[9] It should be recalled that we have only assumed, for purposes of discussion, that the
Commissioner possessed the discretionary power of adopting and enforcing his "current year"
requirement. As discussed earlier in this opinion, no such power has been delegated to him,
and the legislature chose instead to place administration of the Act in the hands of local school
authorities in matters of policy and procedure.